**MARGARET S., on her own behalf and on behalf of all others similarly situated; Dr. Roy Wood, Dr. Calvin Jackson, and Dr. Duncan McKellar, on their own behalf and on behalf of all others similarly situated; and Clinical Leasing Services, Inc., d/b/a Delta Women's Clinic, Orleans Women's Clinic and Causeway Medical Suite**

v.

**Edwin W. EDWARDS, Governor of the State of Louisiana; William J. Guste, Jr., Attorney General of the State of Louisiana; William Cherry, M.D., Secretary of the State of Louisiana Health and Human Resources Administration; all of the above in their individual and official capacities.**

Civ. A. No. 78–2765.

United States District Court,
E. D. Louisiana.

March 3, 1980.

George M. Strickler, New Orleans, La., Judith Levin, Janet Benshoof, New York City, Wayne G. Hawley, Cleveland, Ohio, John Wilson Reed, New Orleans, La., Stephen Landsman, Cleveland, Ohio, for plaintiffs.

Michael R. Connelly, Baton Rouge, La., Louis M. Jones, Ronald Davis, New Orleans, La., for defendants.

Sidney M. Bach, New Orleans, La., for intervenor Dr. Okpalobi.

Lane Carson, New Orleans, La., James Bopp, Jr., Indianapolis, Ind., Robert E. Winn, New Orleans, La., for intervenors Dr. Moorman, Carr, Gaudin & Richey, amici curiae.

Nadine Taub, Newark, N. J., for American Public Health, amicus curiae.

Leo Pfeffer, New York City, for American Humanist Ass'n, amicus curiae.

## OPINION

ROBERT F. COLLINS, District Judge.

This case presents a constitutional challenge to a recently enacted Louisiana statute regulating abortion. La.Rev.Stat.Ann. §§ 40:1299.35.1 *et seq.* (West Supp.1979). In approaching the issues presented in this case, this Court thinks that the following quotation from the landmark decision of *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) is relevant:

> We forthwith acknowledge our awareness of the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians, and of the deep and seemingly absolute convictions that the subject inspires. One's philosophy, one's experiences, one's exposure to the raw edges of human existence, one's religious training, one's attitudes toward life and family and their values, and the moral standards one establishes and seeks to observe, are all likely to influence and to color one's thinking and conclusions about abortion.
>
> In addition, population growth, pollution, poverty, and racial overtones tend to complicate and not to simplify the problem.
>
> Our task, of course, is to resolve the issue by constitutional measurement, free of emotion and of predilection.

*Roe,* 410 U.S. at 116, 93 S.Ct. at 708–09. This Court earnestly seeks to accomplish this task. In pursuing this quest, the Court is bound by decisions of the United States Supreme Court and the jurisprudence which has evolved in this area.

## I.

Margaret S.,[1] a single resident of New Orleans, Louisiana, brought suit in August, 1978 on behalf of herself and all those similarly situated seeking declaratory and in-

1. The name is a pseudonym. By agreement of counsel, Margaret S. was dismissed from the suit on October 18, 1978 because of her refusal to be deposed. By further agreement of counsel, Margaret S. II was substituted as plaintiff in an amended complaint filed November 6, 1978.

junctive relief against the operation of a Louisiana abortion statute, La.Rev.Stat. Ann. §§ 40:1299.35.1 *et seq.* (West Supp. 1979) (the Act). As a single, pregnant woman desirous of obtaining an abortion, Margaret S. alleged that the statute deprived her of fundamental constitutional rights, including her right to due process of law, equal protection, privacy, and the free exercise of religion, in violation of the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the Constitution.

Dr. Roy C. Wood, Dr. Calvin Jackson, and Dr. Duncan McKellar, physicians licensed to practice in Louisiana, sued to represent all present and future Louisiana physicians who "desire to give full, safe, and adequate medical advice and treatment to their patients" but who allegedly would be restricted in their medical practice and threatened with criminal prosecution under the Act. They allege that the Act is vague, overbroad, a denial of equal protection and due process of law, and violative of their rights under the First, Ninth, and Fourteenth Amendments.

Delta Women's Clinic (Delta), with locations in both New Orleans and Baton Rouge, and Orleans Women's Clinic offer gynecological services that include sterilization, first trimester abortions, and abortions subsequent to the first trimester. Causeway Medical Suite offers similar services, but does not perform abortions after the first trimester. All allege that the Act, by "subject[ing] . . . facilities which provide abortion services to regulation and criminal prosecution should they fail to comply with any of the [Act's] provisions," deprives them of their right to privacy and to due process of law under the Constitution of the United States.

Dr. T. C. A. Okpalobi, d/b/a Gentilly Medical Clinic for Women (Gentilly), filed suit September 6, 1978 as a plaintiff-intervenor. After adopting all the claims set out in the original complaint, he focuses on La.Rev.Stat.Ann. §§ 40:1299.35.9, .10 (West Supp.1979). He alleges that these sections violate his right to equal protection and due process of law and that they conflict with La.Rev.Stat.Ann. § 15:476 (West 1967) because of their intrusive effect upon traditional patient-physician confidentiality.

On January 8, 1979, the Court certified this suit as a class action, with Margaret S. II and Dr. Roy C. Wood as named representatives of their respective classes.[2] Trial was held in October and November, 1978. Final arguments were heard December 13, 1978. Final post-trial briefs were filed March 5, 1979.

## II.

Jurisdiction in this case is founded on 28 U.S.C. § 1331(a) (1976)[3] and 28 U.S.C. § 1343(3) (1976).[4]

---

**2.** The classes were defined as follows: Class A, represented by Margaret S. II, consists of "all women in Louisiana capable of bearing children who are now or may become pregnant and who desire or may desire an abortion to be performed in Louisiana by the physician of their choice." Order of January 8, 1979. Class B, represented by Dr. Roy C. Wood, was defined as "all Louisiana physicians who desire or may desire to give full, safe, adequate and responsible medical advice and treatment to their patients, including the performance of abortions, but who have been or will be prevented from doing so because of the restrictions of [La.Rev.Stat.Ann. §§ 40:1299.35.1 *et seq.* (West Supp.1979)] and defendants' actions thereunder." Gentilly Complaint, ¶ III. (A), (B), (C).

**3.** Jurisdiction pursuant to 28 U.S.C. § 1331 exists when "the matter in controversy exceeds the sum or value of $10,000, exclusive of inter-

est and costs, and arises under the Constitution, laws or treaties of the United States." Plaintiffs' complaints allege that the matter in controversy exceeds $10,000. "An allegation in the complaint of the requisite amount will normally suffice to confer jurisdiction upon the court if the claim is made in good faith and unless it appears to a legal certainty that the claim cannot be satisfied." *Lister v. Commissioners Court*, 566 F.2d 490, 492 (5th Cir. 1978) (citation omitted); 14 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3702 at 372–73 (Federal Practice). "Nevertheless, the law is plain that a controversy must be capable of money valuation in order to satisfy the jurisdictional amount requirement . . . . The inherent value alone of a constitutional right is insufficient to satisfy the jurisdictional amount requirement . . . ." *Lister*, 566 F.2d at 493 (citations omitted). *See also City of Milwau-*

**4.** See note 4 on p. 187.

### III.

Two threshold issues must be addressed: "[f]irst, whether the plaintiff[s] allege 'injury in fact,' that is, a sufficiently concrete interest in the outcome of their suit to make it a case or controversy subject to a federal court's Article III jurisdiction, and, second, whether, as a prudential matter, the plaintiff[s] are proper proponents of the particular legal rights on which they base their suit." *Singleton v. Wulff*, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976). The Court must decide whether each class or group of plaintiffs satisfies this criteria.

### A.

■ Margaret S. II: Margaret S. II, a thirty year old single woman and a mother of six children, intervened as a party plaintiff during her second trimester of pregnancy. She stated that she could not obtain and could not afford to obtain an abortion in a hospital. As a single, pregnant woman, Margaret S. II had a concrete interest in challenging the Act. *Roe v. Wade*, 410 U.S. 113, 124–25, 93 S.Ct. 705, 712–13, 35 L.Ed.2d

kee v. Saxbe, 546 F.2d 693, 702–3 (7th Cir. 1976) (5th Amendment); Kucinich v. Forbes, 432 F.Supp. 1101, 1108 n.9 (N.D.Ohio 1977) (1st Amendment). This plain language precludes the Court from adopting one of the routes devised by other courts for circumventing the jurisdictional amount requirement, that of looking at indirect economic effects of alleged civil rights violations, holding civil and constitutional rights to be inherently worth more than $10,000, or "requiring less certainty as to the amount in controversy when substantial rights are at stake . . . ." Federal Practice § 3709 at 492–93.

However, the doctors and clinics have claimed that their right "to practice medicine in their best medical judgment" has also been infringed. *Complaint*, ' VI. (27). There was testimony that fear of violating the statute would cause doctors to cease doing some kinds of abortions at some stages of pregnancy. In addition, the clinics made claims of financial hardship because of the cost of complying with the regulations. Both allege the threat of criminal sanctions, which could result in fines, and, for the doctors, imprisonment and a loss of their licenses. Although the Court refused to allow the defendants to inquire into the financial records of any of the plaintiffs, "[i]n actions seeking declaratory or injunctive relief, it

147 (1973) (*Roe*). Almost every section of the Act would affect either her decision to obtain an abortion or her ability to do so. The Court holds that Margaret S. II has standing to pursue this litigation, that she presents a justiciable controversy, and that the termination of her pregnancy has not rendered her case moot. *Roe*, 410 U.S. at 125, 93 S.Ct. at 712.

### B.

■ Dr. Roy Wood, Dr. Calvin Jackson, Dr. Duncan McKellar, and Dr. T. C. A. Okpalobi: All four physicians present a justiciable controversy and have standing to sue on their own behalf:

The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.

is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 347, 97 S.Ct. 2434, 2443, 53 L.Ed.2d 382 (1977). The object for the doctors and clinics, in addition to the protection of their constitutional rights, is the preservation of their economic livelihood. It is not clear "to a legal certainty" that the livelihood of any individual doctor or clinic is worth less than $10,000. *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). The Court, therefore, does have jurisdiction under 28 U.S.C. § 1331(a) (1976) over the claims of plaintiff doctors and clinics.

4. The jurisdictional basis for plaintiffs' claims under 42 U.S.C. § 1983 is 28 U.S.C. § 1343(3) (1976), which provides in pertinent part:

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States . . . . .

*Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973) (*Doe* ).[5] The physicians also have an "individual economic and liberty interest . . . [in the] right to practice medicine free from the imposition of arbitrary restraints . . . ." *Greco v. Orange Memorial Hospital Corp.,* 513 F.2d 873, 875 (5th Cir.), *cert. denied,* 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975). Furthermore, they have standing to assert the rights of their patients, such as Margaret S. II. *See Singleton v. Wulff,* 428 U.S. 106, 113–18, 96 S.Ct. 2868, 2873–76, 49 L.Ed.2d 826 (1976). *See also Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 1679, 14 L.Ed.2d 510 (1965) (stressing confidentiality and the professional relationship).

### C.

■ Delta Women's Clinic, Orleans Women's Clinic, and Causeway Medical Suite: The clinics present a justiciable controversy since they, as well as the physicians, are threatened with criminal sanctions for failure to comply with certain provisions of the Act.[6] They may also suffer certain financial injuries.[7] There is some debate, however, as to whether the clinics also have standing to assert their patients' claims. These corporate-plaintiffs "are another step removed."[8] It is argua-ble that the corporate-plaintiffs do not share the confidential relationship with their *clients* that the doctors they employ share with their *patients.* Since the issues in this case are adequately represented by Margaret S. II and the physicians, the Court finds it unnecessary[9] to decide whether the corporate-plaintiffs have standing to sue.[10]

### IV.

■ The Court has certified this case as a class action pursuant to Fed.R.Civ.P. 23. Two subclasses were identified, one of women and one of physicians, whose respective representatives are Margaret S. II and Dr. Roy C. Wood.[11] Because the original order was conditional, the Court now affirms its conclusion that this suit was properly brought and certified under Fed.R. Civ.P. 23(b)(2).

### V.

In *Roe,* the Supreme Court concluded that the right to privacy is "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe,* 410 U.S. at 153, 93 S.Ct. at 727. The constitutional right of privacy,[12] "founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon State

**5.** *See also Planned Parenthood of Cent. Mo. v. Danforth,* 428 U.S. 52, 62, 96 S.Ct. 2831, 2837, 49 L.Ed.2d 788 (1976) (*Danforth* ); *Roe v. Ferguson,* 515 F.2d 279, 281 (6th Cir. 1975); *Nyberg v. City of Virginia,* 495 F.2d 1342, 1344 (8th Cir. 1974); *Wynn v. Scott,* 449 F.Supp. 1302, 1309 (N.D.Ill.1978), *aff'd sub nom. Wynn v. Carey,* 599 F.2d 193 (7th Cir. 1979) (*Wynn* ).

**6.** *See* cases cited at n.5 *supra* ; *see also Mahoning Women's Center v. Hunter,* 444 F.Supp. 12, 15 (N.D.Ohio 1977).

**7.** *See Mobile Women's Medical Clinic, Inc. v. Board of Commissioners,* 426 F.Supp. 331, 334 (S.D.Ala.1977).

**8.** *Doe v. Bolton,* 410 U.S. 179, 189, 93 S.Ct. 739, 746, 35 L.Ed.2d 201 (1973) (*Doe*).

**9.** *See Danforth,* 428 U.S. at 62 n.2, 96 S.Ct. at 2838 n.2; *Doe,* 410 U.S. at 189, 93 S.Ct. at 746.

**10.** *Compare Singleton v. Wulff,* 428 U.S. 106, 122–31, 96 S.Ct. 2868, 2878–82, 49 L.Ed.2d 826 (1976) (Powell, J., dissenting) (decision holding that physicians have standing to assert right of third parties is "difficult to cabin") and *Planned Parenthood Ass'n v. Fitzpatrick,* 401 F.Supp. 554, 562 (E.D.Pa.1975), *aff'd sub nom. Franklin v. Fitzpatrick,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976) (*Fitzpatrick* ) *with Carey v. Population Services Int'l,* 431 U.S. 678, 682–84, 97 S.Ct. 2010, 2014–15, 52 L.Ed.2d 675 (1977) and *Planned Parenthood v. Citizens for Community Action,* 558 F.2d 861, 865 n.3 (8th Cir. 1977) and *Fitzgerald v. Porter Memorial Hospital,* 523 F.2d 716, 721 n.23 (7th Cir. 1975).

**11.** *See* n.2, *supra.*

**12.** Congress has also recognized a "right to privacy" that is "a personal and fundamental right protected by the Constitution of the United States." Privacy Act of 1974, 5 U.S.C. § 552a (West 1977). *See also* Alaska Const., Art. I, § 22.

action,"[13] involves "at least two different kinds of interests . . . [:] the individual interest in avoiding disclosure of personal matters . . . and . . . the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977) (footnotes omitted). *Roe v. Wade* implicitly focused on this second interest,[14] "the right of an individual to be free in action, thought, experience, and belief from governmental compulsion."[15] The Supreme Court held that this was a *fundamental* right[16] which could be limited

**13.** *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973) (*Roe*).

**14.** The Act involves both privacy interests. *See* discussion of La.Rev.Stat.Ann. § 40:1299.-35.5, .8, .9 (West Supp.1979) at text accompanying nn.75 and 102–107 *infra*.

**15.** *Whalen v. Roe*, 429 U.S. at 599 n.24, 97 S.Ct. at 876 n.24, *citing* Kurland, *The Private I*, The University of Chicago Magazine 7, 8 (Autumn 1976). The right of privacy is both inward looking, freedom from intrusion, and outward looking, freedom to control the information that is known about you. "Both desires are aspects of the same aspiration: to be master of the identity one creates in the world." L. Tribe, American Constitutional Law § 15–1, 888 (1978) (hereinafter cited as Tribe). *See Holmes v. Burr*, 486 F.2d 55, 67 (9th Cir.), *cert. denied* 414 U.S. 1116, 94 S.Ct. 850, 38 L.Ed.2d 744 (1973) ("The individual's interest in preserving his essential dignity as a human being") (Hufstedler, J., dissenting) (footnote omitted). *See also* A. E. Cooper, *The Physician's Dilemma : Protection of the Patient's Right to Privacy*, 22 St. Louis U.L.J. 397 (1978).

**16.** "[Earlier] decisions make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' . . . are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage, . . . procreation, . . . contraception, . . . family relationships, . . . and child rearing and education . . . ." *Roe*, 410 U.S. at 152–53, 93 S.Ct. at 726 (citations omitted). *See Alma Society, Inc. v. Mellon*, 601 F.2d 1225, 1231–33 (2nd Cir. 1979) (privacy rights of natural parents who have given their children up for adoption); *Shuman v. City of Philadelphia*, 470 F.Supp. 449, 459–60 (E.D.Pa.1979) (policemen could not be required to answer questions about personal life and sexual behavior that had no connection with job performance); *Baird v. Lynch*, 390 F.Supp. 740, 749–51 (W.D.Wis.1974) (access to contraceptive devices); *Berch v. Stahl*, 373 F.Supp. 412, 423–24 (W.D.N.C.1974) (right of imprisoned husband to communicate with wife); *Drake v. Covington County Bd. of Educ.*, 371 F.Supp. 974, 979 (M.D.Ala.1974) (unmarried teacher could not be fired for first trimester abortion); *Assoc. Stud., U. of Cal. at Riverside v. Attorney General*, 368 F.Supp. 11, 22 (C.D.Cal.1973) (access to information about contraception); *Massey v. Parker*, 362 So.2d 1195, 1199 (La.App. 4th Cir. 1978) *writ granted*, 363 So.2d 1385 (La.1978) (Schott, J., dissenting) (right to privacy of natural mother who has given up child for adoption); *State v. Saunders*, 75 N.J. 200, 381 A.2d 333 (1977) (striking state anti-fornication statute). However, the following state actions and asserted individual rights have been held not to be protected by the right of privacy: identification to the State of those individuals to whom doctors are legitimately prescribing dangerous drugs, *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); the right of the expectant mother to have her husband present in the delivery room in a public hospital, *Fitzgerald v. Porter Memorial Hospital*, 523 F.2d 716, 721 (7th Cir. 1975); the right of an unwed mother to refuse to identify the father of her child, *Burdick v. Miech*, 385 F.Supp. 927, 929–30 (E.D.Wis. 1974), *case dismissed on abstention grounds*, 409 F.Supp. 982 (1975); consensual homosexual activity, *Doe v. Commonwealth's Atty.*, 403 F.Supp. 1199, 1200 (E.D.Va.1975), *aff'd* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976) (discussed in Tribe at 941–43, & 1979 Supp. at 87); the right to possess marijuana in one's own home, *Louisiana Affiliate of the Nat'l Org. for the Reform of Marijuana Laws v. Guste*, 380 F.Supp. 404, 406–7 (E.D.La.1974). Access to laetrile has sparked a number of decisions. *Compare Rutherford v. United States*, 582 F.2d 1234 (10th Cir. 1978), (access to laetrile protected), *rev'd on other grounds*, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979); *Rizzo v. United States*, 432 F.Supp. 356, 358 (E.D.N.Y. 1977) *with People v. Privatera*, 23 Cal.3d 697, 153 Cal.Rptr. 431, 591 P.2d 919 (1979) ("the right to obtain drugs of unproven efficiency", such as laetrile, not covered by federal or state right of privacy). *See also In Re Scott K.*, 24 Cal.3d 263, 155 Cal.Rptr. 671, 595 P.2d 105 (1979) (father could not authorize search of son's locked toolbox) (relying in part on *Carey v. Population Services Int'l*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977)). *Compare United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (no protected privacy expectation in bank records) *with Commonwealth v. DeJohn*, —— Pa. ——, 403 A.2d 1283 (1979) and *Burrows v. Superior Court*, 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590 (1974) (protected privacy interest in bank records).

only by compelling state interests. *Roe*, 410 U.S. at 155–56, 93 S.Ct. at 727–28.

Even though the Supreme Court determined that a woman's right to terminate her pregnancy was fundamental,[17] it rejected the argument "that the woman's right is absolute and that she is entitled to terminate her pregnancy at whatever time, in whatever way, and for whatever reason she alone chooses." *Roe*, 410 U.S. at 153, 93 S.Ct. at 727. The "right is not unqualified and must be considered against important state interests in regulation." *Roe*, 410 U.S. at 154, 93 S.Ct. at 727. "The pregnant woman cannot be isolated in her privacy," for she "carries an embryo and, later, a fetus." *Roe*, 410 U.S. at 159, 93 S.Ct. at 730. "[I]t is reasonable and appropriate for a State to decide that at some point in time another interest, that of health of the mother or that of potential human life, becomes significantly involved." *Roe*, 410 U.S. at 159, 93 S.Ct. at 730. In balancing the interests of a pregnant woman with the interests of the State, the Supreme Court identified three stages of pregnancy and defined the limits of state power to regulate abortion during each of those stages:

(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.

*Roe*, 410 U.S. at 164–65, 93 S.Ct. at 732. With these principles in mind, the Court will consider the specific provisions of the Act which have been challenged.

## VI.

### DEFINITIONS: LA.REV.STAT.ANN. § 40:1299.35.1(1) (WEST SUPP.1979)

■ The Act defines abortion as: "the deliberate termination of a human pregnancy after fertilization of a female ovum, by any person, including the pregnant woman herself with an intention other than to produce a live birth or to remove a dead unborn child." La.Rev.Stat.Ann. § 40:1299.35.1 (West Supp.1979). Plaintiffs contend that this definition is impermissibly vague [18]

---

17. Since *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), wherein the Supreme Court recognized that procreation was "fundamental to the very existence and survival of the race," *Skinner*, 316 U.S. at 541, 62 S.Ct. at 1113, the Supreme Court has employed strict scrutiny analysis to review statutes affecting an individual's decision to bear children. Note that freedom over reproductive autonomy includes the entire decisional range, both the decision to bear children, *Cleveland Bd. of Ed. v. LaFleur*, 414 U.S. 632, 640, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974) (struck down regulations that "penaliz[ed] the pregnant teacher for deciding to bear a child"); *Skinner, supra*, as well as the decision not to bear children, *Carey v. Population Services Int'l*, 431 U.S. 678, 685, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977); *Roe, supra*; *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

18. It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abuts upon sensitive areas of basic [fundamental] freedoms," it "operates to inhibit the exercise of [those] freedoms." *Uncertain meanings in-*

because it covers at least two methods of birth control, the intra-uterine device (IUD) and the "morning-after" pill. Both of these methods are deliberate attempts to terminate pregnancy after fertilization but before implantation.[19] Plaintiffs argue that the Act is ambiguous because it includes certain birth control methods not normally thought of as abortion.

It is settled that, as a matter of due process, a criminal statute that "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," . . . or is so indefinite that "it encourages arbitrary and erratic arrests and convictions," is void for vagueness. . . . This appears to be especially true where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights.

*Colautti v. Franklin*, 439 U.S. 596, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979) (citations omitted) (quoting *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954) and *Papachristou v. Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972)).

However, the Court has been unable to discover a definition of abortion that does not suffer from the same vagueness.[20] The Act's definition, although somewhat ambig-

uous, would not mislead a person of ordinary intelligence. "[A] statute will not be struck down as vague even though marginal cases could be put where doubts might arise. . . . And if this general class of offenses can be made constitutionally definite by a reasonable construction of the statute, this Court is under a duty to give the statute that construction." *United States v. Harriss*, 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). *See also Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language."). Abortion, as it is commonly understood, does not include the IUD, the "morning-after" pill, or, for example, birth control pills. The Court finds that the Act's definition of abortion is specific enough to give doctors, clinics, and patients "a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108, 92 S.Ct. at 2298–99.[21]

## ABORTION IN HOSPITALS: LA.REV. STAT.ANN. § 40:1299.35.3 (WEST SUPP. 1979)[22]

This section states: "No person shall perform or induce an abortion upon a pregnant woman subsequent to the end of the first trimester of her pregnancy, unless such

evitably lead citizens to " 'steer wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked."
*Grayned v. City of Rockford*, 408 U.S. 104, 108–9, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) (footnotes omitted) (emphasis added).

19. See Transcript of Dr. Robert D. Crist at 6–9 (hereinafter cited as Crist Tr.).

20. The Court has examined several state statutes defining abortion. They are either similar N.D.Cent.Code § 14.02.1–02(1) (1975) ("the termination of human pregnancy with an intention other than to produce a live birth or to remove a dead embryo or fetus"), or even broader, Del.Code tit. 11, § 654 (1975) ("an act committed . . . with intent to cause a miscarriage"), or fail to define abortion at all, Miss.Code Ann. § 97–3–3 (1972).

21. Plaintiffs have raised no objection to the Act's definition of viable: "potentially able to

live outside of the womb of the mother upon premature birth whether resulting from natural causes or an abortion, or otherwise, and whether that potentially [sic] exists in part due to the provision or availability of natural or artificial life-support systems." La.Rev.Stat.Ann. § 40:-1299.35.1(3) (West Supp.1979).
*Compare Danforth*, 428 U.S. at 63, 96 S.Ct. at 2838; *Roe*, 410 U.S. at 160, 93 S.Ct. at 730 ("potentially able to live outside the mother's womb, albeit with artificial aid") *with Doe v. Zimmerman*, 405 F.Supp. 534, 538–39 (M.D.Pa. 1975).

22. Plaintiffs have not challenged La.Rev.Stat. Ann. § 40:1299.35.2 (West Supp.1979) which requires that abortions be done by a licensed physician. *See Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975); *Roe*, 410 U.S. at 165, 93 S.Ct. at 732; *Spears v. Circuit Court*, 517 F.2d 360 (5th Cir. 1975).

abortion is performed in a hospital."[23] Two problems exist with this provision. First, this section limits access to abortions subsequent to the first trimester of pregnancy (post-first trimester) without regard to the preservation of maternal health. Second, this section represents an attempt by the State to regulate abortion prior to the time period when the State's interest in maternal health becomes compelling.

■ A. *Restricting post-first trimester abortions to hospitals has no rational relationship to preservation of maternal health:* The Court notes that there are severe limitations on the availability of post-first trimester abortions in Louisiana. The Delta Clinics in New Orleans and Baton Rouge and the Orleans Women's Clinic "are the only health facilities in the State of Louisiana that either the Alan Guttmacher Institute[24] or the State Health Department

have been able to identify as doing any second-trimester abortions."[25] The Court finds that there are no Louisiana hospitals performing abortions after the first trimester.[26] Counsel for defendants argued that hospitals will respond to the demand for abortions when clinics can no longer perform them.[27] However, hospitals have not responded to the present demand for post-first trimester abortions[28] by providing service in those areas outside New Orleans and Baton Rouge where there are presently no abortion facilities.[29] Thus, by requiring that post-first trimester abortions, that is abortions after the twelfth or thirteenth week of pregnancy, be performed in hospitals when hospitals are not presently nor prospectively available to perform such abortions is to effectively halt the performance of post-first trimester abortions in Louisiana. This result endangers maternal health by forcing a woman, more than

**23.** There is also a parallel section in La.Rev. Stat.Ann. § 37:1285(8.1) (West Supp.1979) under which the Louisiana State Board of Medical Examiners may revoke, suspend, or refuse to issue a doctor's license or place him on probation if he is found to be "[p]erforming or assisting in the performance of, or procuring, or abetting in the procuring of an abortion or termination of pregnancy after the first trimester: . . . when the procedure is performed outside of a hospital licensed by the Department of Health and Human Resources, or its successor; . . ."

*See Emma G. v. Edwards,* 434 F.Supp. 1048 (E.D.La.1977) (provision requiring that all abortions, regardless of trimester, be done in a hospital was held unconstitutional).

**24.** The Alan Guttmacher Institute (hereinafter AGI) is an independent non-profit research corporation. Its figures on reproductive health care services are used as the official United States census statistics. Its figures are apparently more reliable than those compiled by the Center for Disease Control which is part of the Department of Health, Education and Welfare. Transcript of Barbara L. Lindheim (Lindheim Tr.) at 8–12.

**25.** Lindheim Tr. at 35. Although a military hospital in Louisiana performed two post-first trimester abortions in 1978, the hospital is only allowed to serve active military personnel and their dependents. Moreover, in the future no abortions will be permitted in military hospitals except to save the life of the mother. *Id.* at 30 -31.

**26.** *See* n.25. Dr. Leggio's testimony that it was "common knowledge that Woman's Hospital in Baton Rouge does abortions" is unsupported. Transcript of Dr. Anthony B. Leggio, at 34. AGI figures show that the only two hospitals in Louisiana that do *first* trimester abortions "are both in New Orleans." Lindheim Tr. at 31. Moreover, the Consent for Treatment form at Woman's Hospital contains a disclaimer that if the woman is in an "abortive condition . . . neither the attending physician or any person employed by or connected with the said WOMAN's HOSPITAL has knowingly performed any act which may have contributed to the induction of the abortion." P. Ex. 40.

**27.** This resembles the argument summarily rejected by the Sixth Circuit in *Wolfe v. Schroering,* 541 F.2d 523 (6th Cir. 1976), that "the ban of saline methods would hasten the development of the alternative prostaglandin method in Kentucky." *Wolfe,* 541 F.2d at 527.

**28.** Hospitals have also not responded to the need to provide facilities for first-trimester abortions. *See* n.26.

**29.** In fact, AGI figures indicate that *all* abortion facilities are located in either New Orleans or Baton Rouge. "[T]he State has not identified any providers of any abortion services at all anywhere else in the State of Louisiana except [New Orleans and Baton Rouge.]" Lindheim Tr. at 34. As a result, only 33% of the women who might need an abortion are able to obtain one, as opposed to an average of 71% in the rest of the country. Plaintiffs' Ex. 34A.

twelve weeks pregnant, to select from a range of alternatives more dangerous to maternal health than the performance of a post-first trimester abortion in a clinic, where such abortions are now safely performed.

The situation in Louisiana is analogous to the one described in *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (*Danforth*). In *Danforth*, the Supreme Court considered the constitutionality of a statute which prohibited the use of saline instillation as an abortion method after the twelfth week of pregnancy. At that time, "according to the testimony," *Danforth*, 428 U.S. at 76, 96 S.Ct. at 2844, about 70% of all post-first trimester abortions in the country were done by saline instillation. The only other method that was safer was prostaglandin instillation. Despite the fact that prostaglandin was *theoretically* available as an alternative method, the Supreme Court reversed because the lower court failed to consider certain factors:

> First, it did not recognize the prevalence, as the record conclusively demonstrates, of the use of saline amniocentesis as an accepted medical procedure in this country; the procedure as noted above, is employed in a substantial majority (. . . from 68% to 80%) of all post-first-trimester abortions. Second, it failed to recognize that at the time of trial, there were severe limitations on the availability of the prostaglandin tech-

nique, which, although promising, was used only on an experimental basis until less than two years before. See *Wolfe v. Schroering*, 388 F.Supp. at 637, where it was said that at that time (1974), there were 'no physicians in Kentucky competent in the technique of prostaglandin amnio infusion.' And appellees offered no evidence that prostaglandin abortions were available in Missouri. . . . Finally, the majority did not consider the anomaly inherent in § 9 when it proscribes the use of saline but does not prohibit techniques that are many times more likely to result in maternal death.

*Danforth*, 428 U.S. at 77–78, 96 S.Ct. at 2845 (footnote omitted).

As in *Danforth*, the anomaly in the instant case is that the statute would act to proscribe the safest alternative presently available for post-first trimester abortions, that is performing post-first trimester abortions in a clinic. This would increase problems of maternal health care. Without clinics, a woman will have three options other than foregoing the abortion: self-induced abortion, procurement of an abortion or an abortifacient [30] from an unlicensed practitioner,[31] or travel to another state where post-first trimester abortions are available. The dangers inherent in the first two are clear.[32] The dangers inherent in forcing women out of state are more subtle. Women may lack access to out-of-state facilities.[33] Morbidity and mortality [34] rates will

---

**30.** Margaret S. II testified that she would have taken "pills" to produce a "spontaneous" abortion if she could not have obtained one at Delta. Transcript of Margaret S. II at 130.

**31.** There is also the possibility that doctors would continue to perform abortions, but would report them incorrectly as late first-trimester abortions. This has already occurred. Lindheim Tr. at 28–29.

**32.** The injuries suffered by women obtaining illegal abortions before *Roe* include perforated uteri, lacerated cervixes, sterility from untreated infections and death.

**33.** There is a significant relationship between a woman's distance from an abortion facility and the likelihood that she will obtain an abortion. This relationship impacts most heavily upon

the poor, the young, and the members of minority groups. Lindheim Tr. at 47. Further, the out-of-state clinics may have only one or two already overburdened doctors available.

Ironically, because "generally the availability of abortion services in the region is relatively low, and the involvement of hospitals in performing abortions is far lower in the region than in the nation as a whole," it is likely that the facilities for women who went to Florida, Georgia, Texas, Alabama, Mississippi, or Tennessee for post-first trimester abortions would in fact be clinics, rather than hospitals. *Id.* at 38.

**34.** Morbidity rates are general complication rates, usually non-fatal. Mortality rates are rates of fatal complications. Tietze Tr. at 67–68, 94–96.

rise because the abortion is delayed[35] and the follow-up is perforce negligible.[36] For many, the cost will be prohibitive.[37]

The emphasis in *Danforth* and *Wolfe v. Schroering*, 388 F.Supp. 631 (W.D.Ky.1974), aff'd, 541 F.2d 523, 526–27 (6th Cir. 1976), is on the lack of available alternative *methods* of post-first trimester abortions.[38] "The State, through [La.Rev.Stat.Ann. § 40:1299.35.3], would prohibit the use of a method [*i. e.* clinic post-first trimester abortions] which the record shows is the one most commonly used [in Louisiana] by physicians after the first trimester and which is safer, with respect to maternal mortality, than even continuation of the pregnancy until normal childbirth." *Danforth*, 428 U.S. at 78, 96 S.Ct. at 2845. Moreover, "as a practical matter, it forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed." *Danforth*, 428 U.S. at 78–79, 96 S.Ct. at 2845. The requirement that post-first trimester abortions be performed in hospitals is not a "regulation [that] reasonably relates to the preservation and protection of maternal health." *Roe*, 410 U.S. at 163, 93 S.Ct. at

732. Rather, it is a requirement that "burden[s] an individual's right to decide to prevent conception or terminate pregnancy by substantially limiting access to the means of effectuating that decision . . . ." *Carey v. Population Services International*, 431 U.S. 678, 688, 97 S.Ct. 2010, 2018, 52 L.Ed.2d 675 (1977).[39] This section also presents a second problem which the Court must address.

■ B. *Because the dilation and evacuation (D & E) method of abortion up to the eighteenth week of pregnancy is safer than childbirth, the State's interest in regulating abortion prior to the eighteenth week of pregnancy is not "compelling":* Under the rationale of *Roe*, "[t]he abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician" up to the point where maternal mortality rates in abortion approach those in childbirth. *Roe*, 410 U.S. at 164, 93 S.Ct. at 732. Before that point has been reached, "any interest of the State in protecting the woman from an inherently hazardous procedure, except when it would be equally dangerous for her to forego it,

**35.** Unintended pregnancies most often affect those with the least resources. "The fact is that barriers to availability of abortion, be they financial, or geographic, or procedural, tend to impact most strongly on young, poor, and minority women. At the same time, the women who are presented for second-trimester abortions tend also to be young and poor and minority more than the population in general, so you really are getting a double effect." Lindheim Tr. at 56–57. Black women have a mortality rate three times that of white women. Tietze Tr. at 97. Complications become more frequent *and* more serious with each week of delay. Tietze Tr. at 67–68, 170–81. *See* P. Ex. 27(G), (J).

Young teenagers who carry their pregnancies to term have much higher rates of toxemia (ten times), eclampsia and dystocia, and must undergo a Caesarean section much more often that older women. Crist Tr. at 137–39.

**36.** Crist Tr. at 37–38.

**37.** In other states, abortions after the first trimester of pregnancy performed in a hospital cost between $585 and $735 (hospital fee of $435 plus a surgeon's fee of $150 to $300). Lindheim Tr. at 51–53. First-trimester clinic abortions average $175. *Id.* at 54. If Louisiana women were added to the out-of-state demand

for post-first trimester abortions, "prices would probably go up because you have more demand being placed on a limited supply." *Id.* at 54–55. *See* Complaint, ¶ III.(A)(5).

**38.** "[Prostaglandin] is not readily available in this geographical territory. . . . With prostaglandin unavailable, and saline prohibited, the woman wishing abortion after the first trimester is practically rendered destitute, her only recourse, hysterotomy, being by far the most dangerous of the three methods." *Wolfe*, 388 F.Supp. at 637. Banning the saline method was " 'almost tantamount' to a prohibition of post-first trimester abortions." *Wolfe*, 541 F.2d at 527 (Stephens, J. concurring in part and dissenting in part, *quoting Danforth*, 428 U.S. at 102, 96 S.Ct. at 2856).

**39.** An out-of-state abortion cannot be safer than an in-state dilation and evacuation method (D & E) abortion. Even if the out-of-state facility used the D & E procedure, the delay caused by looking for the facility and travelling to it would increase the morbidity and mortality rates. Every day's delay is statistically significant. *See* P. Ex. 27(G), (J); Tietze Tr. at 67–69, 71–74, 95.

has largely disappeared."[40] *Roe*, 410 U.S. at 149, 93 S.Ct. at 725. *Roe* held that the State's compelling interest in maternal health "in light of present medical knowledge" emerged at the end of the first trimester. *Roe*, 410 U.S. at 163, 93 S.Ct. at 731. "This is so because of the now-established medical fact, referred to above, that until the end of the first trimester mortality in abortion may be less than mortality in childbirth." *Roe*, 410 U.S. at 163, 93 S.Ct. at 732.[41]

Since the *Roe* decision, major advances have occurred in medical knowledge.[42] The post-first trimester abortion technique, dilation and evacuation (D & E), was relatively unknown at the time of the *Roe* decision. Presently, D & E has become the most common procedure employed to terminate pregnancies where the gestation period exceeds twelve weeks. D & E is an accepted method of abortion that is far safer than any other method currently used. In Louisiana, nearly all doctors use the D & E method when performing post-first trimester abortions; and, both Delta and Orleans Women's Clinic use the D & E method when performing post-first trimester abortions. Based upon the evidence presented at trial, the Court finds that the D & E method of abortion up to the eighteenth week of pregnancy is safer than childbirth.[43] If there is no *compelling* state interest until abortion threatens maternal health in the same degree as does childbirth, then the State cannot impose regulations at a time—after the twelfth week and before the eighteenth week of pregnancy—

40. "[N]o published studies presently available directly compare the safety of hospital and non-hospital second-trimester abortions . . . [However, an HEW study (P. Ex. 17, at 8)] revealed no major differences between the risks of death in the two types of institutions, and emphasized that 'operator skill was probably more important than operative setting as a risk factor.' . . . If non-hospital facilities, therefore, meet adequate minimum standards for dealing with the complications which may occur with second-trimester abortion, there is no longer any reason to believe that the hospital setting is safer. *Indeed if, as this study concludes, operator skill is the critical factor in predicting risk of morbidity and mortality associated with abortion, non-hospital facilities may well be much safer because of the extensive abortion experience of physicians in such clinics.*" The American Public Health Association (APHA) Brief at 17–18 (emphasis added). *See also* Tietze Tr. at 82 ("The high [death] rates in the first two years [after *Roe*] are doubtless a reflection of the inexperience at that time, and what you can also demonstrate is, as I have indicated, from data in Britain [a falling death rate] is just as with us, doctors learning.") and *Id.* 137–38.

It would not promote maternal welfare to compel women to obtain post-first trimester abortions in hospitals, if they were available, where the doctors are almost totally inexperienced, rather than to allow women to benefit from the clinic doctors' expertise. Crist Tr. at 30–32.

41. In reaching this conclusion the Supreme Court referred in a footnote, 410 U.S. at 149 n.44, 93 S.Ct. at 725 n.44, to several studies, including three by Dr. Tietze.

42. *See* APHA Brief at 3, 14.

43. Tietze Tr. at 102–103. Grimes, et al., *Methods of Mid-Trimester Abortion: Which is Safest?*, International Journal ·of Gynecology & Obstetrics 15:184, 186 (1977) ("significantly safer than saline") (HEW study); Cates, et al., *The Effect of Delay and Method Choice on the Risk of Abortion Morbidity,* 9 Family Planning Perspectives 266, 268 (1977) ("D & E was more than 160 per cent safer than saline instillation, which in turn was 60 per cent safer than [prostaglandin] instillation.") (study done by the Dept. of Health, Education & Welfare's Center for Disease Control); Plaintiffs' Exhibit 27(K) at T24–6 (slide presented by Dr. Tietze) (6.6 deaths per hundred thousand abortions as compared to 13.7 per hundred thousand for normal childbirth.); APHA Brief at 14–17. Note, moreover that the Louisiana maternal mortality rate has ranged as high as 21.5 per hundred thousand livebirths. Defendants' Answers to Plaintiffs' Interrogatories, Attachment VI, at 7 (1976 figure). Use of the D & E method was not considered in *Wynn*, 449 F.Supp. at 1318.

A statute that permitted post-first trimester D & E abortions to be performed in clinics but required that post-first trimester abortions performed by any other method be done in hospitals was recently upheld as rational, because of the safety of the D & E method. *Livingston v. New Jersey Bd. of Medical Examiners*, 168 N.J. Super. 259, 402 A.2d 967 (1979).

Dr. Wood, who is associated with Delta, performed over 2,400 abortions in the last four years using the D & E method. About 1700 of these were done after the first trimester. Tietze Tr. at 76. His reported morbidity rate using the D & E method is two-thirds better than the national rate. *Id.*

when the abortion method used, D & E, is far safer than childbirth.[44] Thus, the State's interest in protecting maternal health does not become compelling until the eighteenth week of pregnancy.

■ Because La.Rev.Stat.Ann. § 40:-1299.35.3 (West Supp.1979) requires abortions after the first trimester to be performed in a hospital, limiting access to abortion without regard to preservation of maternal health, and because it attempts to regulate abortions prior to the time when the State's interest in maternal health becomes compelling, the Court holds that the instant section is unconstitutional. *Accord, Planned Parenthood Association of Kansas City, Missouri, Inc. v. Ashcroft*, 483 F.Supp. 679 at 685–687 (W.D.Mo.1980).

### ABORTION AFTER VIABILITY: LA. REV.STAT.ANN. § 40:1299.35.4 (WEST SUPP.1979)

A. *Roe* provides that the State, because of its legitimate interest in potential life, may regulate and even forbid abortions after a fetus becomes viable, "except when it is necessary to preserve the life or health of the mother." *Roe*, 410 U.S. at 164, 93 S.Ct. at 732. The first sentence of La.Rev.Stat. Ann. § 40:1299.35.4(A) (West Supp.1979),[45] while appearing to follow the guidelines set forth in *Roe*, uses the phrase "to prevent *permanent impairment* to her health." (Emphasis added.) This is not the same standard articulated in *Roe*, *preservation of maternal health*. A doctor could determine that an abortion was necessary for the preservation of the immediate health of the mother (an emergency), or for the preserva-

tion of her health in the near future (a woman presently unable to face the stress of childbearing), or for the preservation of her health in the distant future (a woman for whom another pregnancy would mean an elevated risk of having a serious, but not permanent, illness). In other words, the concern may be for the mother's immediate or long-term health. This section, on the other hand, only permits an abortion after viability where it will prevent permanent impairment to a woman's health. Even if doctors could determine in advance which births would create risks of "permanent" impairment, it is impermissible to force them to do so. Preserving maternal health means more than preventing permanent incapacity. A rape or incest victim may not be able to prove that her mental health will be *permanently* impaired if she is forced to bear her attacker's child, but she might be able to show that it is necessary to preserve her immediate mental health. The Act eliminates consideration of any disability that is not permanent, even if the impairment lingers for months or years before it ultimately disappears. The Court finds that the requirement of *permanent* impairment impermissibly constricts the meaning of *Roe*.

■ This section also requires that the attending physician obtain the certification of one or perhaps two other doctors[46] to confirm his judgment as to both the necessity of performing the abortion and the consequences of not doing so. Such "confirmation" proceedings will not withstand constitutional challenge:

> abortion upon a pregnant woman after such time as her unborn child has become viable, two physicians after examining the patient shall first certify in writing that the abortion is necessary to prevent the death of a pregnant woman or to prevent permanent impairment to her health and shall further certify in writing the medical indications for such abortion and the probable health consequences if the abortion is not performed or induced.

---

**44.** The defendants introduced no evidence to show either that D & E was not the method of choice of the Louisiana doctors who do post-first trimester abortions or that they were not the "skilled" operators referred to in Dr. Tietze's testimony. Tietze Tr. at 103.

**45.** La.Rev.Stat.Ann. § 40:1299.35.4(A) states:
No physician shall perform or induce an abortion upon a pregnant woman after such time as her unborn child has become viable, unless such abortion is necessary to prevent the death of the pregnant woman or to prevent permanent impairment to her health. Before a physician may perform or induce an

**46.** It is unclear whether the original physician may be one of the two certifying physicians. The State argues that only one other physician is necessary.

If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies. Required acquiescence by co-practitioners has no rational connection with a patient's needs and unduly infringes on the physician's right to practice.

*Doe v. Bolton,* 410 U.S. 179, 199, 93 S.Ct. 739, 751, 35 L.Ed.2d 201 (1973).

The Court therefore holds that La.Rev.Stat. Ann. § 40:1299.35.4(A) is an unconstitutional infringement upon a physician's right to practice.

B. La.Rev.Stat.Ann. § 40:1299.35.4(B)[47] establishes a presumption of viability for fetuses that are more than twenty-four weeks old. *Roe* and its progeny[48] have made it clear that neither legislatures nor courts may establish such presumptions. Determination of viability is a decision which *must* be left to the attending physician.

[V]iability [is] a matter of medical judgment, skill, and technical ability . . . [I]t is not the proper function of the legislature or the courts to place viability, which essentially is a medical concept, at a specific point in the gestation period. The time when viability is achieved may vary with each pregnancy, and the determination of whether a particular fetus is viable is, and must be, a matter for the

judgment of the responsible attending physician.

*Danforth,* 428 U.S. at 64, 96 S.Ct. at 2839 (discussing, in part, *Roe*'s analysis).

This determination was recently reaffirmed in *Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (*Colautti*):

Viability is reached when, in the judgment of the attending physician on the particular facts of the case before him, there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support. Because this point may differ with each pregnancy, neither the legislature nor the courts may proclaim one of the elements entering into the ascertainment of viability—be it weeks of gestation or fetal weight or any other single factor—as the determinant of when the State has a compelling interest in the life or health of the fetus. Viability is the critical point. And we have recognized no attempt to stretch the point of viability one way or the other.

*Colautti,* 99 S.Ct. at 682.

Defendants argue that the statute imposes only a *presumption* of viability which the physician can rebut on the basis of his own examination. However, this apparent flexibility cannot save the section. In a significant number of pregnancies doctors cannot accurately[49] determine how old the fetus is

---

**47.** La.Rev.Stat.Ann. § 40:1299.35.4(B) states:

An unborn child shall be presumed to be viable if more than twenty-four weeks have elapsed from the probable beginning of the last menstrual period of the pregnant woman, based upon either information provided by her or through examination by her attending physician. If it is the judgment of the attending physician that the particular unborn child is not viable where the presumption of viability exists, then before such physician may perform or induce an abortion upon the pregnant woman he shall first certify in writing that the particular unborn child is not viable and shall further certify the precise medical findings upon which he bases that judgment.

Since § 40:1299.35.6(B)(4) (see *infra*) assumes that conception occurs two weeks after the last menstrual period (LMP), the Act is based on a premise that both ovulation and conception occur exactly fourteen days after the onset of the last menstrual period. However, "[e]stimates of gestational age based on LMP cannot be determined in 15–30 per cent of pregnancies." P. Ex. 19, at 12–3 (The report of the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research, entitled *Research on the Fetus*, published by the Dept. of Health, Education & Welfare).

**48.** *See Hodgson v. Lawson,* 542 F.2d 1350, 1355 (8th Cir. 1976); *Floyd v. Anders,* 440 F.Supp. 535, 539 (D.S.C.1977); *Wolfe v. Schroering,* 388 F.Supp. 631, 635 (W.D.Ky.1974), *aff'd* 541 F.2d 523 (6th Cir. 1976).

**49.** *See* n.47 *supra.* Many women have irregular periods and some continue to have "spotting" after they become pregnant so that a real LMP cannot be determined. Testimony of Dr. Wilke (Benshoof Aff. ¶ 39) and Dr. Jackson

and cannot, therefore, determine whether the presumption is applicable. Even the most modern technique, ultrasonic cephalometry,[50] has an error rate of plus or minus two weeks.[51] In order to avoid aborting a twenty-six-week-old fetus, doctors would have to cease doing abortions after the twenty-third week.[52]

■ More fundamentally, it would be impossible to rebut a presumption of viability with absolute certainty. Viability cannot be determined with *precision* until after birth. The question of whether a particular infant will survive cannot be answered before the infant is born. Before then, it is a matter of statistical probability, involving estimates of fetal age, health, weight, maternal health, and the availability of neonatal care.[53] Since the Act does not make the doctor's good faith determination of non-viability conclusive,[54] the State could bring a criminal action questioning the doctor's determination. In such a criminal action, "precise medical findings" that a fetus had less than 1/250,000 chance of survival [55]

might be insufficient for certain juries. *See Colautti*, 99 S.Ct. at 686. In order to protect himself, a doctor could not rely on his own findings and belief that, under the circumstances, a particular fetus was or was not viable, but would be forced to abide by the latest statistics from the most modern neo-natal care center and hope that the local prosecutor had the same figures. This is a statute that is ripe for "arbitrary and erratic arrests and convictions." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). It is also a statute that, by setting up an essentially irrebuttable presumption of viability, effectively takes the determination of viability out of the hands of the physician. The Court holds that La.Rev.Stat. Ann. § 40:1299.35.4(B) is an unconstitutional infringement on a physician's right to practice medicine.

C. La.Rev.Stat.Ann. § 40:1299.35.4(C) [56] requires that once the presumption of viability exists the doctors must use the abortion method most likely to preserve the

(Levin Aff. ¶ 26). The problem is compounded for women who do not keep accurate records of their periods so that a pattern can be established or who are dealing with doctors who, because they are not regular family physicians, are not familiar with the patient's menstrual cycle. Moreover, a doctor cannot rely on estimates of fetal weight (obtained by manual abdominal palpation) to determine gestational age. "The error of the experienced obstetrician in determining fetal weight in this matter increases with decreasing weight from the end of the first trimester through the beginning of the second trimester and may be greater than 100 per cent. Thus, the physician's estimate of the weight of a 600 gram fetus *in utero* may be consistent with delivery of a 1000–2000 gram premature infant." P. Ex. 19, at 12–8. Fetal age may be *estimated* by several methods, including chemical analysis, *id.*, but even "combined use of several of these methods to estimate gestational age has not demonstrably decreased this [plus or minus two weeks rate of] error." *Id.* The most accurate measure of gestational age *at birth* also has an error rate of plus or minus two weeks. *Id.* at 12–16.

50. This technique compares the fetus' linear head dimensions with those obtained from fetuses of women with reliable menstrual periods. P. Ex. 19, at 12–8.

51. *Id.*

52. Given the criminal penalties for making a wrong guess, more cautious or more inexperienced doctors might retreat even further. Crist Tr. at 50. Apparently, some forms of genetic testing cannot be done until after eighteen to twenty weeks gestation. *Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 682 n.8, 58 L.Ed.2d 596 (1979) (*Colautti*).

53. P. Ex. 19, at 12–6, 50 (Figure 4).

54. As argued by plaintiff's counsel in *Colautti*, the State could, for example, "[have made] the physician's good-faith determination of viability conclusive." *Colautti*, 99 S.Ct. at 682.

55. Based on Canadian data, a probability of 1/276,531 is actually a 3.6 chance per million live births, for fetuses weighing 601–650 grams. Similar weight data based on total deliveries at one major premature referral center are not available for the United States. *But see* P. Ex. 19, at 12–5, 12–91 to 12–103 (Tables 17–22, 25).

56. La.Rev.Stat.Ann. § 40:1299.35.4(C) states: "Any physician who shall perform or induce an abortion upon a pregnant woman where the presumption of viability exists shall utilize the available method or technique of abortion most likely to preserve the life and health of the unborn child."

fetus. Even if the presumption of viability were valid, this section does not meet the standard set forth in *Roe*, which allows the State to forbid every abortion after viability "except when it is necessary to preserve the life or health of the mother." *Roe*, 410 U.S. at 164, 93 S.Ct. at 732. It is undisputed that the method most likely to preserve the life of the fetus is a hysterotomy,[57] a form of major surgery in which the contents of the uterus are removed through an abdominal incision.[58] However, this is also the method involving the highest risk to the mother's health.[59] As a result of this section,[60] a doctor who has determined that an abortion near the time of viability is necessary to preserve the life or health of the mother faces a dilemma: although the purpose of the operation is to preserve a woman's health, this section forces the doctor to perform a hysterotomy, the operative method most dangerous to his patient. Presumably the doctor owes an ethical duty to the woman who is his patient, a duty which mandates use of the *least* dangerous method of abortion. This section, by forcing him to disregard his duty to the woman, paralyzes his ability to act in those situations "when it is necessary to preserve the life or health of the mother." *Roe*, 410 U.S. at 164, 93 S.Ct. at 732.[61] If he performs a dilation and evacuation, he is liable under the Act for failure to consider the fetus. If he performs a hysterotomy, he would be open to a malpractice action for failure to consider the woman.

The Supreme Court has recently passed upon the Pennsylvania Abortion Control Act, Pa.Stat.Ann., Tit. 35, § 6605(a) (Purdon 1977), which "subjects a physician who performs an abortion to potential criminal liability if he fails to utilize a statutorily prescribed technique when the fetus 'is viable' or when there is 'sufficient reason to believe that the fetus may be viable.'" *Colautti*, 99 S.Ct. at 678. The Pennsylvania statute directs the physician to employ an abortion technique best suited to fetal survival "'so long as a different technique would not be *necessary* in order to preserve the life or health of the mother.'" *Colautti*, 99 S.Ct. at 688 (citing Pa.Stat.Ann., Tit. 35, § 6605(a)) (original emphasis). This statute is similar to La.Rev.Stat.Ann. § 40:1299.35.4(C), with one noteworthy difference: the Pennsylvania statute recognizes the importance of the preservation of the mother's health and welfare when the health interests of the fetus and mother conflict. The Louisiana statute, on the oth-

---

**57.** Tietze Tr. at 79; Crist Tr. at 48. *See also Colautti*, 99 S.Ct. at 687. Injections of prostaglandin and saline solution expose the fetus to toxic chemicals and traumatic expulsion from the womb. Both D & E and D & C abortions involve cutting and crushing of the fetus.

**58.** A post-operative hospital stay of five to seven days is required. Defense witness Dr. James Moorman stated that "any time you put a scar through the uterus you make a woman a reproductive cripple . . . ." Moorman Tr. at 134.

**59.** "Hysterotomies [are] most likely to protect the life of the fetus and [have] the highest complication rate for the woman; prostaglandin produces quite often a live, although not surviving, fetus, which has the next lower complication rate; saline almost never produces a live fetus, and that complication rate is still smaller, [in terms of a] major complication rate; then D & E never produces a live fetus, and the complication rate is lowest, so the order is exactly reversed." Tietze Tr. at 79–80. *See also* P. Ex. 27(H) (morbidity rates); P. Ex. 14, Table 23 (mortality rates).

**60.** There is a parallel section in La.Rev.Stat. Ann. § 37:1285(8) (West Supp.1979):

The [Louisiana State Board of Medical Examiners] may refuse to issue, or may suspend or revoke any license or permit, or impose probationary or other restrictions on any license or permit . . . for . . . :
. . . (8) Performing, or assisting in the performance of, or procuring or abetting in procuring an abortion or termination of pregnancy during the third trimester or after viability of the fetus, unless the physician determines that such abortion or termination of pregnancy is necessary, in his best medical judgment, in order to save the life or health of the pregnant woman and/or of the fetus (unborn child) . . . .

**61.** The instant section attempts to extend the physician-patient relationship to the fetus *as a separate individual. See* Note, *Medical Responsibility of Fetal Survival Under Roe and Doe*, 10 Harv.Civ.Rts.—Civ.Lib.L.Rev. 444 (1975).

er hand, orders the physician to employ an abortion technique most likely to preserve the health of the fetus without regard to the preservation of maternal health. Thus, the Pennsylvania statute provides greater protection for the preservation of maternal welfare than does the Louisiana statute. The Supreme Court, however, struck down the Pennsylvania statute because:

> it is uncertain whether the statute permits the physician to consider his duty to the patient to be paramount to his duty to the fetus, or whether it requires the physician to make a "trade-off" between the woman's health and additional percentage points of fetal survival. Serious ethical and constitutional difficulties, that we do not address, lurk behind this ambiguity. We hold only that where conflicting duties of this magnitude are involved, the State, at the least, must proceed with greater precision before it may subject a physician to possible criminal sanctions.

*Colautti*, 99 S.Ct. at 688.

La.Rev.Stat.Ann. § 40:1299.35.4(C) places the physician in a graver dilemma than the Pennsylvania statute because it is silent with respect to the protection of the mother's health. This Court concludes that La. Rev.Stat.Ann. § 40:1299.35.4(C) is void for vagueness.

D. La.Rev.Stat.Ann. § 40:1299.35.4(D) [62] requires that a second physician be in attendance when a fetus is aborted after via-

bility.[63] The pregnant woman's physician, while he is inducing the abortion, and the second physician, after the abortion, "shall take all reasonable steps . . . to preserve the life and health of the unborn child."

Once viability exists, "the State's important and legitimate interest in potential life" becomes compelling. *Roe*, 410 U.S. at 163–64, 93 S.Ct. at 732. In order to protect that interest, the State may regulate post-viability abortions heavily or it may forbid them outright, except when it is necessary to preserve the life or health of the mother. *Roe*, 410 U.S. at 163, 93 S.Ct. at 731. Thus, this Court rejects the argument that once the State decides to allow post-viability abortions, it must allow them to be done under the least restrictive conditions. The mere requirement that a second physician be present does not invade the first physician's right to practice medicine since there is no requirement that the second physician approve of any action that the first physician takes. It is apparent that, no matter which abortion method a doctor uses, the second physician will seldom serve any useful function.[64] However, the State can choose to be prepared for those rare instances when there is a live birth. *See Floyd v. Anders*, 440 F.Supp. 535 (D.S.C. 1977) (fetus aborted in 25th week survived twenty days after prostaglandin injection).

The argument that the requirement will add severely to the cost [65] of these abortions

---

**62.** La.Rev.Stat.Ann. § 40–1299.35.4(D) states: An abortion of a viable child shall be performed or induced only when there is in attendance a physician other than the physician performing or inducing the abortion who shall take control of and provide immediate medical care for a child born as a result of the abortion. During the performance or inducement of the abortion, the physician performing or inducing it, and subsequent to the abortion, the physician required by this Subsection to be in attendance, shall take all reasonable steps in keeping with good medical practice, consistent with the procedure used, to preserve the life and health of the unborn child.

**63.** Because of the discussion above, the Court considers this subsection as using "viable" only as it is defined in § 40:1299.35.1(3), and not as

including those situations where the "presumption" of viability would allegedly exist.

**64.** *See* n.57, *supra*.

**65.** The Court notes that Margaret S. II and many members of Class A are poor women. However, the "[Supreme] Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis." *Maher v. Roe*, 432 U.S. 464, 471, 97 S.Ct. 2376, 2381, 53 L.Ed.2d 484 (1977). *See Ross v. Moffitt*, 417 U.S. 600, 615, 94 S.Ct. 2437, 2446, 41 L.Ed.2d 341 (1974); *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 29, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). However, "[t]he Supreme Court's declining commitment to economic justice . . . must not be permitted to obscure the continuing relevance of economic inequality to issues

is not persuasive in favor of striking the section. In *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), the Supreme Court held that states could refuse to provide any public funding for elective abortions despite the heavy impact this would have on a poor woman's choice whether or not to have an abortion.

The Connecticut regulation places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion . . . continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult—and in some cases, perhaps, impossible—for some women to have abortions is neither created or in any way affected by the Connecticut regulation.

*Maher v. Roe*, 432 U.S. at 474, 97 S.Ct. at 2383.[66]

A similar "value judgment favoring childbirth over abortion" which the Court found permissible in *Maher v. Roe*, 432 U.S. at 474, 97 S.Ct. at 2382, is at work in this section: the Louisiana statute is designed to enhance the probability of survival, how-ever minute, for fetuses aborted in post-viability, abortions. The mere physical presence, therefore, of a second physician is not impermissible.

■ Although the requirement that a second physician be present is permissible, La.Rev.Stat.Ann. § 40:1299.35.4(D) is invalid because it suffers from the same infirmities as La.Rev.Stat.Ann. § 40:1299.35.4(C). La.Rev.Stat.Ann. § 40:1299.35.4(D) requires that "[d]uring the performance or inducement of the abortion, the physician . . . shall take all reasonable steps in keeping with good medical practice, consistent with the procedure used, to preserve the life and health of the unborn child." This places the physician in the same dilemma of making "a 'trade-off' between the woman's health and additional points of fetal survival." *Colautti*, 99 S.Ct. at 688.

Furthermore, this requirement raises other serious questions. For example, if a doctor decided to do a hysterotomy, to whom is his duty owed "in keeping with good medical practice"? If it is to the mother, can the second doctor intervene if he decides that the first doctor is *not* taking all the reasonable steps he could to preserve the fetus?[67] An operating room is not a practical place to resolve such ethical disputes. The danger that the mother's health will be jeopardized is clear. The physical

---

of personal liberty when restrictive laws take their greatest toll upon the poor." Tribe, at 931 n.68. *See Maher v. Roe*, 432 U.S. at 482–83, 97 S.Ct. at 2386–87 (Brennan, J., dissenting); *Beal v. Doe*, 432 U.S. 454, 455–56, 97 S.Ct. 2394, 2395, 53 L.Ed.2d 464 (1977) (Marshall, J. dissenting). *Fox Valley Reproductive Health Care Center, Inc. v. Arft*, 446 F.Supp. 1072, 1073–74 (E.D.Wis.1978), granted a preliminary injunction against massive regulation at least in part because it would have doubled or tripled the cost of first-trimester abortions. *But see McRae v. Department of Health, Education and Welfare*, No. 76C–1804 (E.D.N.Y. Jan. 15, 1980) probable jurisdiction noted by United States Supreme Court February 19, 1980.

**66.** *But cf. Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (Discussing the economic effect of a statute that directly infringed on indigents' right to marry (a fundamental right)).

**67.** Similarly, would the second physician have the right to prevent injection of more saline solution or prostaglandin if the first physician wanted to speed up the proceedings to shorten the mother's labor time in order to save her mental anguish or physical pain or to save himself waiting time? Who would referee such disputes? *See* questions raised in *Hodgson v. Flakne*, 463 F.Supp. 67 (D.Minn.1978); *Wynn v. Scott*, 449 F.Supp. 1302, 1319 (N.D.Ill.1978), *aff'd sub nom. Wynn v. Carey*, 599 F.2d 193 (7th Cir. 1979) ("[The section] does not clarify whether the attending physician may perform an abortion after viability if the consulting physicians do not agree that the procedure is medically necessary to preserve the woman's life or health. Undoubtedly the attending physician would prefer to err on the side of safety and forego the abortion, even if his or her professional belief that the abortion was necessary were sincere and well founded").

relationship between the woman and the fetus is too close to allow two physicians to pursue adverse treatment strategies for the mother and fetus. Thus, this Court holds that "where conflicting duties of this magnitude are involved, the State, at the least, must proceed with greater precision before it may subject a physician to possible criminal sanctions." *Colautti*, 99 S.Ct. at 688.

## NOTICE AND CONSENT: LA.REV. STAT.ANN. § 40:1299.35.5 (WEST SUPP.1979)

La.Rev.Stat.Ann. § 40:1299.35.5 (West Supp.1979) consists of two paragraphs, § 40:1299.35.5(A)[68] and § 40:1299.35.5(B).[69] These two paragraphs impose certain restrictions on the ability of a minor pregnant woman to obtain an abortion, thus restricting the minor's right of privacy. "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Danforth*, 428 U.S. at 74, 96 S.Ct. at 2843. However, this Court recognizes that "the State has somewhat broader authority to regulate the activities of children than of adults." *Danforth*, 428 U.S. at 74, 96 S.Ct. at 2843.

The Supreme Court has "recognized three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed ma-

ture manner; and the importance of the parental role in child-rearing." *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 3043, 61 L.Ed.2d 797 (1979) (*Bellotti*). "In [La.Rev. Stat.Ann. § 40:1299.35.5 Louisiana] has attempted to reconcile the constitutional right of a woman, in consultation with her physician, to choose to terminate her pregnancy as established by *Roe v. Wade* [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)] and *Doe v. Bolton* [410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973)], with the special interest of the State in encouraging an unmarried pregnant minor to seek the advice [and/or consent] of her parents in making the important decision whether or not to bear a child." *Bellotti*, 99 S.Ct. at 3046. This Court is:

concerned here with a constitutional right to seek an abortion. The abortion decision differs in important ways from other decisions that may be made during minority. The need to preserve the constitutional right and the unique nature of the abortion decision, especially when made by a minor, require a State to act with particular sensitivity when it legislates to foster parental involvement in this matter.

*Bellotti*, 99 S.Ct. at 3047.

With these principles in mind, the Court will analyze whether La.Rev.Stat.Ann. § 40:1299.35.5 meets constitutional standards. For convenience, the Court will first address the problems raised in paragraph B of La.Rev.Stat.Ann. § 40:1299.35.5.

---

**68.** La.Rev.Stat.Ann. § 40:1299.35.5(A) states:

No physician shall perform or induce an abortion upon an unmarried pregnant woman under the age of eighteen years without first having given at least twenty-four hours actual notice to one of the parents or the legal guardian of the minor pregnant woman as to the intention to perform such abortion, or if such parent or guardian cannot be reached after a reasonable effort to find him or her, without first having given at least seventy-two hours constructive notice to one of the parents or the legal guardian of the minor pregnant woman by certified mail to the last known address of one of the parents or guardian, computed from the time of mailing, unless the abortion is ordered by a court

having jurisdiction over such minor pregnant woman.

**69.** La.Rev.Stat.Ann. § 40:1299.35.5(B) states:

No physician shall perform or induce an abortion upon a minor pregnant woman under the age of fifteen years without first having obtained the informed written consent of the minor pregnant woman in accordance with 40:1299.35.6, and

1. First having obtained the informed written consent of one of her parents or her legal guardian in accordance with R.S. 41:1299.35.6, or

2. The minor pregnant woman first having obtained an order from a court having jurisdiction over her that the abortion be performed or induced.

CONSENT: LA.REV.STAT.ANN. § 40:1299.35.5(B) (WEST SUPP.1979)

La.Rev.Stat.Ann. § 40:1299.35.5(B) requires that any minor under the age of fifteen who desires an abortion must obtain either the written consent of her parent or guardian, or obtain an order from a court having jurisdiction over her permitting the abortion to be performed.[70] The constitutionality of this paragraph is not a case of first impression because the Supreme Court has enunciated certain guidelines in *Bellotti.* There, the Supreme Court concluded: "if the State decides to require a pregnant minor to obtain one or both parents' consent to an abortion, it also must provide an alternative procedure whereby authorization for the abortion can be obtained." *Bellotti*, 99 S.Ct. at 3048. Although La.Rev.Stat.Ann. § 40:1299.35.5(B) provides an alternative procedure, the Court must decide whether this procedure complies with strictures enunciated in *Bellotti.* This section says nothing more than the pregnant minor may receive an order from a "court having jurisdiction over her that the abortion be performed or induced." This is not enough:

A pregnant minor is entitled in such a proceeding to show either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests. The proceeding in which this showing is made must assure that a resolution of the issue, and any

appeals that may follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained.

*Bellotti*, 99 S.Ct. at 3048–49 (footnotes omitted).[71]

Applying the above quoted language from *Bellotti* to the instant section, the Court notes the following infirmities. La.Rev.Stat.Ann. § 40:1299.35.5(B) sets forth no standards or guidelines for the minor seeking judicial approval for abortion. For example, no provision is made for expedited hearing and for expedited appeal, the necessity for which is obvious in an abortion situation. Also the instant section does not insure the minor's anonymity during the judicial proceeding. The Court holds that La.Rev.Stat.Ann. § 40:1299.35.5(B) fails to provide a procedure which satisfies the standards enunciated in *Bellotti* and it is, therefore, unconstitutional.

NOTICE: LA.REV.STAT.ANN. § 40:1299.35.5(A) (WEST SUPP.1979)

La.Rev.Stat.Ann. § 40:1299.35.5(A) [72] states that a physician cannot perform an abortion until he gives twenty-four hours actual notice or seventy-two hours constructive notice to a parent or legal guardian of all unmarried women under the age of eighteen who decide to obtain an abortion. The notice requirement is unnecessary if a court orders the abortion.[73] The Court must decide whether this requirement infringes upon the ability of a minor to obtain an abortion, thus restricting the minor's constitutional right of privacy.

**70.** La.Rev.Stat.Ann. § 40:1299.35.5(B) also requires that the doctor obtain the "informed consent," as detailed in La.Rev.Stat.Ann. § 40:1299.35.6, of the minor and the parent. The Court will assume for purposes of this discussion that only those parts of La.Rev.Stat. Ann. § 40:1299.35.6 which the Court has upheld are included. *See* text accompanying nn. 76–82.

**71.** Even though a majority of the Justices in *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti*) did not join the Court's opinion written by Justice Powell, this Court holds that the standard enunciated by the Supreme Court can be relied upon as a

guide which sets forth the minimum procedural guarantees.

**72.** See n.68, *supra.*

**73.** See n.68, *supra.* It is not clear whether this section was intended to set up a procedure which permits an unmarried woman under the age of eighteen to request a court order waiving the notice requirement or whether it was intended merely to relieve the physician of the additional burden of sending out the notice in a case in which the court has ordered that the abortion be performed. Merely clarifying this ambiguity would not relieve this section of serious constitutional difficulties.

The Court notes that while this section applies to all unmarried women under the age of eighteen, its effect upon the age group between fifteen and seventeen years must be considered separately from its effect upon the age group less than fifteen years old. A pregnant woman under the age of fifteen has an option either to obtain a court ordered abortion without notifying her parents or to obtain parental consent which will operate to notify her parents.

The State chose to exclude the age group between fifteen and seventeen from any requirement of parental consent before obtaining an abortion. See La.Rev.Stat.Ann. § 40:1299.35.5(B) (West Supp.1979). Apparently, the State determined that a minor woman between the ages of fifteen and seventeen is mature enough to make the decision whether to obtain an abortion without the necessity of either parental consent or a court order. Thus in Louisiana the following paradoxical situation exists: A seventeen year old woman, deemed by the State to be mature enough to obtain an abortion without parental consent, must nonetheless notify her parents that she is seeking an abortion or obtain a court ordered abortion.

Ostensibly, the notice requirement furthers the State's interest in insuring that parents are given the opportunity to participate in an important and potentially traumatic decision in the life of their minor daughter, thus promoting family dialogue and harmony. However, any state interest in encouraging consultation between the daughter who is seeking an abortion and her parents is not necessarily achieved by the notice requirement because merely giving notice to the parents does not assure that there will be any meaningful dialogue. In many cases the notice requirement will cause family disharmony because it will inform parents who may oppose their daughter obtaining an abortion, yet, those parents will be legally powerless to prevent their daughter from obtaining an abortion.

The most significant difficulty with La. Rev.Stat.Ann. § 40:1299.35.5(A) is that it does not consider the minor's constitutional right of privacy. The Supreme Court has indicated that the constitutionally protected "zone of privacy" involves at least two different kinds of interests. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." Whalen v. Roe, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977) (footnotes omitted). La. Rev.Stat.Ann. § 40:1299.35.5(A) substantially affects a minor's right to avoid the disclosure of personal matters. One of the most personal matters that can be disclosed is the fact that a woman is seeking an abortion.[74] Roe commands that, during the first trimester, "the abortion decision . . . must be left to the medical judgment of the pregnant woman's attending physician." Roe, 410 U.S. at 164, 93 S.Ct. at 732. The physician, "in consultation with his patient" and no one else, must determine whether or not to go ahead with the abortion. Roe, 410 U.S. at 163, 93 S.Ct. at 731. Privacy can not exist when third parties are privy to the discussion. Furthermore, this section may also have a chilling affect on the minor's right to independently make certain kinds of important decisions which are the basis of a woman's constitutional right to obtain an abortion. Roe, 410 U.S. at 152–62, 93 S.Ct. at 726–31. Thus, both kinds of privacy interests are at issue here.

■ It must be remembered that "[a] child, merely on account of his minority, is not beyond the protection of the Constitution." Bellotti, 99 S.Ct. at 3043. The need to protect the constitutional right and the unique nature of the abortion decision, especially when made by a minor, required that the State act with particular sensitivity when it legislates to foster parental involvement in this matter. Bellotti, 99 S.Ct. at 3047. Although the Supreme Court did not explicitly rule on whether the require-

---

**74.** Under state law, doctors would risk charges of unprofessional conduct, La.Rev.Stat.Ann. § 37:1285(13) (West Supp.1979), if they disclosed patient confidences. Public hospital records are confidential, La.Rev.Stat.Ann. § 44:7 (West Supp.1980).

ment of giving notice to the parents of an unmarried minor was unconstitutional, it did rule on a similar issue. In *Bellotti*, the Supreme Court construed the constitutionality of a Massachusetts statute which required that a pregnant minor seeking an abortion must obtain the consent of her parents or obtain judicial approval following notification to her parents. The Supreme Court held that the statute did not satisfy constitutional standards because "it requires parental consultation or notification in every instance, without affording the pregnant minor an opportunity to receive an independent judicial determination that she is mature enough to consent or that an abortion would be in her best interests." *Bellotti*, 99 S.Ct. at 3052 (footnotes omitted). "If she satisfies the court that she is mature and well-informed enough to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent." *Bellotti*, 99 S.Ct. at 3050. The *Bellotti* parental notice requirement is similar to the one in the instant case. Under the Massachusetts statute, even though a minor woman may obtain a court ordered abortion, she must still inform her parents. Under the Louisiana statute, even though a minor between the ages of fifteen and seventeen years is not required to obtain anyone's consent for an abortion, she too must inform her parents. Applying the rationale of *Bellotti* to the instant case, minors between the ages of fifteen and seventeen years old should be permitted to obtain an abortion without any requirement of parental notice or consultation. Therefore, the Court will strike La.Rev.Stat.Ann. § 40:1299.35.5(A), because it imposes an undue burden upon the exercise of the right to obtain an abortion of unmarried women between the ages of fifteen and seventeen years.

The Court notes that there may also exist constitutional problems with La.Rev.Stat. Ann. § 40:1299.35 [75] which repeats the parental notice requirement and details its procedure. However, La.Rev.Stat.Ann. § 40:1299.35, enacted a week after La.Rev. Stat.Ann. § 40:1299.35.5, has not been challenged by plaintiffs and is not properly before the Court at this time. Thus, the Court will refrain from deciding the constitutionality of La.Rev.Stat.Ann. § 40:1299.-35. It is therefore unnecessary for the Court to consider whether the statutes are vague because La.Rev.Stat.Ann. § 40:1299.-35.5(A) applies to unmarried women under the age of eighteen years, and La.Rev.Stat. Ann. § 40:1299.35 applies to unemancipated minors. The Court has reviewed all sections of the Act as if the language of La. Rev.Stat.Ann. § 40:1299.35.5, dealing with guardian or parental notice and consent, had been struck.

### INFORMED CONSENT: LA.REV.STAT. ANN. § 40:1299.35.6 (WEST SUPP.1979) [76]

This section of the Act provides: "An abortion otherwise permitted by law shall

**75.** La.Rev.Stat.Ann. § 40:1299.35 states:

*Informing parents of impending abortion for minor* Before any abortion is performed on an unemancipated minor the person performing said abortion shall require written proof that at least one parent or the legal guardian of the unemancipated minor has been given at least seventy-two hours notice of the minor's intention to obtain an abortion. The written proof required will be in the form of a notarized statement of the parent or legal guardian attesting to the fact that he or she was informed by the unemancipated minor of her intention to obtain an abortion. Said statement will also affirmatively attest to the date and time that such notice was received. If the parent or guardian refuses to execute such affidavit, the person performing the

abortion shall require an affidavit of an adult who shall attest to the fact of notification to the parent or legal guardian, the date and time thereof, and that said parent or legal guardian refused to execute an affidavit regarding the notice received. The person performing the abortion will maintain for a period of at least five years the written proof required herein and will make it available for inspection by representatives of all public health and law enforcement agencies. Any violation of this statute will be punishable by a maximum fine of five thousand dollars or imprisonment for ninety days or both.

**76.** La.Rev.Stat.Ann. § 40:1299:35.6(A)–(D) states:

A. An abortion otherwise permitted by law shall be performed or induced only with the

be performed or induced only with the informed written consent of the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with R.S. 40:1299.35.5 [Notice and Consent], given freely and without coercion." La.Rev.Stat.Ann. § 40:1299.35.6 (A) (West Supp.1979). La.Rev.Stat.Ann. § 40:1299.35.6(B) consists of facts a woman's physician must communicate to insure that the woman's consent is an informed consent. The physician is also required to provide the patient with information concerning the risks of pregnancy and abortion. Finally, this section requires that the pregnant woman sign a copy of a consent form.

 The duty "to disclose the risks and alternatives of proposed treatment are not innovations in American law. . . . The root premise jurisprudentially is that '[e]very human being of adult years and sound mind has a right to determine what

informed written consent of the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with R.S. 40:1299.35.5, given freely and without coercion.

B. In order to insure that the consent for an abortion is truly informed consent, an abortion shall be performed or induced upon a pregnant woman only after she, and one of her parents or her legal guardian whose consent is required in accordance with R.S. 40:1299.35.5(B) herein, have been orally informed by her attending physician of the following facts and have signed a consent form acknowledging that she, and the parent or legal guardian when applicable, have been informed as follows:

1. That according to the best judgment of her attending physician she is pregnant.

2. The number of weeks elapsed from the probable time of the conception of her unborn child, based upon the information provided by her as to the time of her last menstrual period or after a history and physical examination and appropriate laboratory tests.

3. That the unborn child is a human life from the moment of conception and that there has been described in detail the anatomical and physiological characteristics of the particular unborn child at the gestational point of development at which time the abortion is to be performed, including, but not limited to, appearance, mobility, tactile sensitivity, including pain, perception or response, brain and heart function, the presence of internal organs and the presence of external members.

4. That her unborn child may be viable and thus capable of surviving outside of her womb, if more than twenty-two weeks have elapsed from the time of conception, and that her attending physician has a legal obligation to take all reasonable steps to preserve the life and health of her viable unborn child during the abortion.

5. That abortion is a major surgical procedure which can result in serious complications, including hemmorrhage [sic] perforated uterus, infection, menstrual disturbances, sterility and miscarriages and prematurity in subsequent pregnancies, and that abortion may leave essentially unaffected or may worsen any existing psychological problems she may have, and can result in severe emotional disturbances.

6. That numerous public and private agencies and services are available to provide her with natural family planning and artificial birth control information, and that her physician will provide her with a list of said agencies and the services available.

7. That numerous public and private agencies and services are available to assist her during pregnancy and after the birth of her child, if she chooses not to have the abortion, whether she wishes to keep her child or place him or her for adoption, and that her physician will provide her with a list of such agencies and services.

8. That locations of public mental health agencies shall be made available to the patient if and when post-partum psychological damage requires professional attention.

C. At the same time the attending physician provides the information required by Paragraph B of this Section, he shall, at least orally, inform the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with R.S. 40:1299.35.5 herein, of the particular risks associated with her own pregnancy and the abortion technique to be employed including providing her with at least a general description of the medical instructions to be followed subsequent to the abortion in order to insure her safe recovery, and shall in addition provide her with such other information which in his own medical judgment is relevant to her decision as to whether to have an abortion or to carry her pregnancy to term.

D. The attending physician performing or inducing the abortion shall provide the pregnant woman, or one of her parents or legal guardian signing the consent form where applicable, with a duplicate copy of the consent form signed by her and one of her parents or her legal guardian where applicable, in accordance with Paragraph B of this Section.

shall be done with his own body . . . .' True consent . . . is the informed exercise of a choice, and that entails an opportunity to evaluate knowledgeably the options available and the risks attendant upon each." *Karp v. Cooley*, 493 F.2d 408, 419 (5th Cir.), *cert. denied*, 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73 (1974), *quoting Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914) (Cardozo, J.).[77] Informed consent involves the fiduciary[78] nature of the doctor-patient relationship as well as the "basic right of self-determination"[79] that governs potential invasions of physical integrity. The aim is to encourage awareness in the patient's mind of the risks associated with a medical procedure and to obtain his assent to encountering those risks. "The doctrine of informed consent . . . promotes individual autonomy and integrity of the patient; it encourages him to engage in rational decision-making; and it enhances health care delivery by increasing doctor-patient communication and reducing physician liability."[80] The appellation "informed consent" is somewhat misleading because the actual emphasis is on the physician's duty to *inform* his patient rather than on the patient's understanding of the physician's explanation. *Karp*, 493 F.2d at 420 n.14. Therefore, the general rule is that all risks need not be disclosed.[81] Even jurisdictions

77. For a general review of the doctrine, *see* articles cited in Waltz & Scheuneman, *Informed Consent to Therapy*, 64 N.W.U.L.Rev. 628, n.1 (1970) [hereinafter cited as *Informed Consent*].

78. Gauvey *et al., Informed and Substitute Consent to Health Care Procedures: A Proposal for State Legislature*, 15 Harv.J.Legis. 431, 438 (1978) [hereinafter cited as *Informed & Substitute Consent*]. The ideal picture is of a doctor who engages in a thoughtful discussion with the patient. "In fact, this may not be the physician's way. He will probably engage in a measure of salesmanship to persuade his patient to consent, particularly when time is short and treatment must be commenced quickly. The permissible limits of this sort of persuasion are difficult to trace, short of the point where it might legitimately be said that the patient's consent was actively induced by the physician when, because of the risks involved, he would not otherwise have consented. Such coercion will always be difficult to prove, since subtle questions of the psychological effect of the physician's actions are involved." *Informed Consent*, at 645–46 (1970) (footnote omitted).

79. Shapiro, *The Abortion Alternative & the Patient's Right to Know*, 1978 Wash.U.L.Q. 167, 175 (1978).

80. *Informed & Substitute Consent*, at 438.

81. In *Karp v. Cooley*, 493 F.2d 408, 419 n.11 (5th Cir. 1974), *cert. denied*, 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73 (1974), the Fifth Circuit stated:

[T]he majority rule . . . compels a physician to disclose facts which a reasonable medical practitioner in a similar community and of the same school of medical thought would have disclosed to his patient regarding the proposed treatment. . . . A "minority" rule has developed requiring disclosure of all "material" information which a reasonable man in the situation which the physician knew or should have known to be the plaintiff's would deem significant in making a decision to undergo the recommended treatment.

(Citations omitted.)

Louisiana has adopted the minority rule. *See Hanks v. Drs. Ranson, Swan & Burch, Ltd.*, 359 So.2d 1089, 1092–93 (La.App. 3rd Cir. 1978), *writ denied*, 360 So.2d 1178 (1978); *Percle v. St. Paul Fire & Marine Ins. Co.*, 349 So.2d 1289, 1299–1300 (La.App. 1st Cir. 1977).

"There is no bright line separating the significant [risk] from the insignificant; the answer in any case must abide a rule of reason. . . The disclosure doctrine, like others marking lines between permissible and impermissible behavior in medical practice, is in essence a requirement of conduct prudent under the circumstances." *Canterbury v. Spence*, 150 U.S. App.D.C. 263, 279, 464 F.2d 772, 788 (D.C.Cir. 1972).

Commentators have discussed the question of disclosing *all* risks in terms of a self-evident proposition. "A physician probably need not disclose every risk which *could* be disclosed, if only because of the time required to disclose every remote risk. Less than 'total' disclosure will satisfy the law's demands, but how much less?" *Informed Consent*, at 635. For the answer of some courts *see Sawyer v. Methodist Hospital*, 522 F.2d 1102, 1106–7 (6th Cir. 1975) (no need to reveal risk with incidence rate of .013%); *Dunham v. Wright*, 423 F.2d 940, 946 (3rd Cir. 1970); *Niblack v. United States*, 438 F.Supp. 383, 388 (D.Colo.1977) (no need to reveal "insignificant" risk); *Parker v. St. Paul Fire & Marine Ins. Co.*, 335 So.2d 725, 733 (La.App. 2nd Cir. 1976); *writ denied*, 338 So.2d 700 (1976) ("It is not incumbent upon an attending physician to advise a patient as to every conceivable possibility and eventuality

which base informed consent statutes on the broader base of materiality require disclosure only "when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to undergo the proposed therapy." [82]

In *Danforth*, the Supreme Court held that it is both "desirable and imperative" that women make the decision as to whether *or not* to have an abortion "with full knowledge of its nature and consequences." *Danforth*, 428 U.S. at 67, 96 S.Ct. at 2840. La.Rev.Stat.Ann. § 40:1299.35.6(A) is successfully directed and limited to that end. Unfortunately, portions of La.Rev.Stat. Ann. § 40:1299.35.6(B) are not as well drafted. The *Danforth* opinion [83] did not inquire into the *basis* of informed consent:

> One might well wonder, offhand, just what "informed consent" of a patient is. The three Missouri judges who composed the three-judge District Court, however,

were not concerned, and we are content to accept, as the meaning, the giving of information to the patient as to just what would be done and as to its consequences. *To ascribe more meaning than this might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession.*
*Danforth*, 428 U.S. at 67 n.8, 96 S.Ct. at 2840 n.8 (emphasis added).

Flexible informed consent statutes leaving specific details to the doctor's best judgment have been upheld.[84] However, analysis of La.Rev.Stat.Ann. § 40:1299.35.6(B) reveals constitutional infirmities closely analogous to those discussed in *Wynn v. Scott*, 449 F.Supp. 1302 (N.D.Ill.1978), *aff'd sub nom. Wynn v. Carey*, 599 F.2d 193 (7th Cir. 1979).[85]

**▓** *La.Rev.Stat.Ann. § 40:1299.35.6(B) (3)*: The Court has already held [86] that the most advanced method of determining fetal age has an error rate of plus or minus two weeks. During the first trimester,

---

. . . ."); *Hanks*, 359 So.2d at 1092; *Delaune v. Davis*, 316 So.2d 7, 11–12 (La.App. 1st Cir. 1975); *Informed Consent*, at 638 n.37 and cases cited therein. *See also* 45 C.F.R. § 46.103(C) (1)–(3) (1978).

**82.** *Informed Consent* at 640.

**83.** The statute under discussion in *Danforth* stated:

Section 3. No abortion shall be performed prior to the end of the first twelve weeks of pregnancy except:

\* \* \* \* \* \*

(2) After the woman, prior to submitting to the abortion, certifies in writing her consent to the abortion and that her consent is informed and freely given and is not the result of coercion.

*Planned Parenthood of Cent. Mo. v. Danforth*, 392 F.Supp. 1362, 1365 (E.D.Mo.1975), *aff'd in part, rev'd in part and remanded*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).

**84.** *See Hodgson v. Lawson*, 542 F.2d 1350, 1355–56 (8th Cir. 1976), *rev'g* 378 F.Supp. 1008, 1013 (D.Minn.1974) ("after a full explanation of the procedures and effect of the abortion"); *Wolfe v. Schroering*, 541 F.2d 523, 526 (6th Cir. 1976) ("inform the expectant mother of the reasonably possible physical and mental consequences of the performance of the abortion or the nonperformance of the abortion."); *Mobile Women's Medical Clinic, Inc. v. Bd. of Comm'rs.*, 426 F.Supp. 331, 335 (S.D.Ala.1977)

("a statement indicating informed consent"); *Doe v. Deschamps*, 461 F.Supp. 682, 683 (D.Mont.1976) ("the nature of the surgical procedure, its consequences and alternatives, and that the patient has voluntarily consented to the procedure.").

One semi-restrictive statute was upheld in *Planned Parenthood Ass'n v. Fitzpatrick*, 401 F.Supp. 554 (E.D.Pa.1975), *aff'd sub nom. Franklin v. Fitzpatrick*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976), *see* n.10 *supra*. However, the only discussion of the provision occurred in a dissenting opinion, 401 F.Supp. at 583, and a concurring opinion that took issue with the dissenting opinion, 401 F.Supp. at 586. The Supreme Court affirmed without opinion.

**85.** The Illinois abortion statute under consideration in *Wynn v. Scott* required that a woman be informed of:

(a) The physical competency of the fetus at the time the abortion is to be performed, such as, but not limited to, what the fetus looks like, the fetus [sic] ability to move, swallow, and its physical characteristics;

(b) The general dangers of abortion, including, but not limited to, the possibility of subsequent sterility, premature birth, live-born fetus and other dangers; . . .
449 F.Supp. at 1316.

**86.** *See* nn.47 & 49, *supra*, and accompanying text.

when the vast majority of abortions occur,[87] development of the fetus is extremely rapid.[88] Since a doctor can not pinpoint the exact age of a fetus, the doctor will have to describe fetal development over a five week period, the week the doctor *thinks* is accurate, plus two weeks on either side in case of error. The statute, however, does not give the doctor that option. Instead, it *requires* him, under threat of criminal penalties, to describe the fetus "at the gestational point of development at which time the abortion is to be performed . . . ." This can not be done by a conscientious physician. Even if he protects himself by including an extra two weeks on either side, he still has no assurance that under the statute he has included sufficient detail.

Furthermore, the requirement that physicians inform women of specific items in a manner "including but not limited to", is "both overly vague and overly specific." *Wynn v. Scott,* 449 F.Supp. at 1317.

> The physician does not have fair warning of what is required. It is unclear whether the state could prosecute a physician for failure to warn the woman of a danger not included in the list. On the other hand, the very specificity . . . [required] places the physician in the "straitjacket" condemned in *Danforth.*
>
> *Wynn,* 449 F.Supp. at 1317.

The doctor's right and ability to practice medicine "free from the imposition of arbitrary restraints" will be injured no matter how he attempts to comply with the statute. *Greco v. Orange Memorial Hospital Corp.,* 513 F.2d 873, 875 (5th Cir.), *cert. denied,* 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975).

Finally, La.Rev.Stat.Ann. § 40:1299.35.-6(B)(3) is also unconstitutional because it

forces the doctor to state that "the unborn child is a human life from the moment of conception . . . ." This statement disregards *Roe*'s finding that the state may not make a determination that life begins at the moment of conception:[89] "Since the fetus is not a person, . . . neither is it a child." *Poe v. Gerstein,* 517 F.2d 787, 796 (5th Cir. 1975), (citing *Roe,* 410 U.S. at 156–58, 93 S.Ct. at 728–29), *aff'd sub nom. Gerstein v. Poe,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976). *See also Carver v. Hooker,* 501 F.2d 1244, 1246 n.2 (1st Cir. 1974); *Doe v. Israel,* 482 F.2d 156, 159 (1st Cir. 1973).

La.Rev.Stat.Ann. § 40:1299.35.-6(B)(4): This section includes the impermissible presumption[90] that viability occurs twenty-two weeks after conception. Although the section begins with the permissive language "may be viable", it concludes with language that asserts an obligation to a "viable unborn child." Since it is impossible[91] for a doctor to tell whether a fetus is viable until *after* birth,[92] the statute is based on the assumption that the fetus is viable twenty-two weeks after conception. If it were not, the doctor could not tell when his legal obligation to the fetus arose. La.Rev.Stat.Ann. § 40:1299.35.6(B)(4) is unconstitutional because it is based on an irrebuttable presumption of viability. *Colautti,* 99 S.Ct. at 686.

*La.Rev.Stat.Ann. § 40:1299.35.6(B)(5):* This section mandates that physicians make the following statements to patients to insure "truly informed consent":

> That abortion is a major surgical procedure which can result in serious complications, including hemorrhage, perforated uterus, infection, menstrual disturbances, sterility and miscarriages and prematuri-

---

87. P. Ex. 14, at 3.

88. Transcript of Dr. Jay Katz [hereinafter cited as Katz Tr.], at 34.

89. "Texas urges that, . . . life begins at conception and is present throughout pregnancy . . . . . . [T]he unborn have never been recognized in the law as persons in the whole sense." *Roe,* 410 U.S. at 159, 162, 93 S.Ct. at 730–31.

90. *See* discussion of § 40:1299.35.4(B), nn.47–55 *supra* and accompanying text.

91. For a discussion of the difficulty in determining fetal age, *see* nn.47 & 49, *supra* and accompanying text.

92. For a discussion of § 40:1299.35.4(B), nn.47–55, *supra.*

ty in subsequent pregnancies, and that abortion may leave essentially unaffected or may worsen any existing psychological problems she may have, and can result in severe emotional disturbances.

La.Rev.Stat.Ann. § 40:1299.35.6(B)(5) (West Supp.1979).

In determining the constitutionality of such a provision the Court must balance the State's legitimate interest in maternal health against the patient's right to consult her physician without state interference. The Eighth Circuit Court of Appeals has recently weighed these two competing interests:

> The legitimate state interest at stake here is protecting the mother by requiring an informed consent to the abortion decision. The Court in *Danforth* held that Mo.Ann.Stat. § 188.020(2) (Vernon 1978), Missouri's informed consent provision, was not "in itself an unconstitutional requirement. The decision to abort, indeed, is an important, and often stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences." *Planned Parenthood v. Danforth, supra,* 428 U.S. at 67, 96 S.Ct. at 2840. *But the Supreme Court did not hold that a state may require physicians to provide to each pa-tient any and all information required by the state, regardless of its legality, truth, constitutionality or medical advisability.* "[W]e are content to accept, as the meaning [of informed consent], the giving of information to the patient as to just what would be done and as to its consequences. *To ascribe more meaning than this might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession."* *Planned Parenthood v. Danforth, supra,* 428 U.S. at 67 n.8, 96 S.Ct. at 2840. *Freiman v. Ashcroft,* 584 F.2d 247, 251 (8th Cir. 1978) (emphasis added), *aff'd,* 440 U.S. 941, 99 S.Ct. 1416, 59 L.Ed.2d 630 (1979).

The Court holds that La.Rev.Stat.Ann. § 40:1299.35.6(B)(5) places physicians in "an undesired and uncomfortable straitjacket" *Danforth,* 428 U.S. at 67 n.8, 96 S.Ct. at 2840 n.8, because the physician is permitted no discretion as to what type of information should be conveyed to each patient. Further this section forces the physician to communicate to his patients questionable factual information.[93] The evidence demonstrated, and the Court so finds, that in the overwhelming number of cases, abortion is a *minor* surgical procedure, not a major surgical procedure.[94]

**93.** Drs. Tietze, Crist, Soderstrom and Jackson all testified as to the lack of any evidence that abortion causes either miscarriages or prematurity in subsequent pregnancies. Tietze Tr. at 112–20; Crist Tr. at 69–71; Soderstrom Tr. at 22, 30–1; Jackson Tr. at 201; Levin Aff. at " 24. The Court did not find Dr. Wilke's testimony in this area to be credible. He repeatedly denounced studies published in reputable medical journals as faulty without stating any basis for such opinions. Benshoof Aff., ¶¶ 43, 44. The so-called Klinger study, on which he relied, was discredited by Dr. Tietze insofar as it has any applicability to the United States. Tietze Tr. at 120–4. His testimony, Benshoof Aff., " 44, on a Japanese study, itself of questionable validity (Tietze Tr. at 126), was inaccurate. *See* Intervenor's [now Amicus Curiae] Ex. 35; Tietze Tr. at 127. It is questionable whether either the Czechoslovakian or the Finnish study to which he referred, Benshoof Aff., ¶ 44, actually exists. Tietze Tr. at 127–30.

Dr. Dickey was a credible witness. His report to the Food & Drug Administration referred to "*[r]eports* of increased sterility and a high incidence of mid-trimester abortion and immature and premature delivery in subsequent pregnancies following mechanically-induced abortion [that] have existed for some time." Dickey Tr. at 159 (emphasis added). However, the three studies he cited dealt with infection and risks of uterine laceration or cervical incompetence, three risks plaintiffs acknowledge exist. He did not have a working familiarity with the most recent studies, Dickey Tr. at 173–75, nor with certain relevant underlying factors of the studies which he did cite, Dickey Tr. at 175.

**94.** Tietze Tr. at 110; Soderstrom Tr. at 12–20; Jackson Tr. at 199–200; Wood Tr. at 255; Okpalobi Tr. at 308–309; Levin Aff. ¶ 66; Williams Tr. at 154–55; Dickey Tr. at 178. Dr. Moorman stated it depended on how you define "major." Moorman Tr. at 151–52. Some abortions, such as those on high risk patients, and some *forms* of abortion, such as hysterotomy, are major surgery. Williams Tr. at 154 (entry of a major body cavity). However, under the Act *all* abortions must be so described. To

■ Other courts have also weighed the State's competing interest in informed consent for abortion procedures against the patient's right to consult her physician without state interference. In *Akron Center for Reproductive Health, Inc. v. Akron*, 479 F.Supp. 1172 (N.D.Ohio 1979), that Court construed an Akron ordinance regulating abortion. The Akron ordinance required physicians to make the identical disclosures contained in the instant section. The Ohio Court found that the Akron ordinance was impermissible:

> The Court has no doubt that the state could constitutionally require that all abortion patients be counselled, either by their attending physician or another individual having specified minimum qualifications. *The state cannot, however, go beyond that to specify what each patient must be told. That determination must be left to the individual counselor based upon the needs of the particular patient.* Otherwise, the physician is being placed in the "undesired and uncomfortable straitjacket" warned against by the Supreme Court. This is not impermissible because of any perceived interference with rights of the physician. Rather, it is impermissible because it interferes with the woman's right to consult a physician who is free from such state interference.

*Akron Center for Reproductive Health, Inc. v. Akron*, 479 F.Supp. at 1203 (N.D. Ohio 1979) (footnotes omitted) (emphasis added).

The Court, therefore, similarly holds that La.Rev.Stat.Ann. § 40:1299.35.6(B)(5) (West Supp.1979) is unconstitutional.

■ *La.Rev.Stat.Ann. § 40:1299.35.6(B)(6):* Informed consent is designed to foster patient knowledge about the risks and benefits of a particular procedure. "Informed consent requires an exchange of information between the physician and patient which culminates in a decision made by the patient based on this information." Gauvey, *et al., Informed and Substitute Consent to Health Care Procedures: A Proposal for State Legislatures,* 15 Harv.J.Legis. 431, 439 (1978) (hereinafter *Gauvey*). The instant section requires the physician to communicate information to the patient dealing with natural and artificial birth control. The Court holds that information concerning birth control techniques is not rationally related to the giving of informed consent for an abortion procedure. At that point in time when a woman decides between abortion and birth, information about birth control techniques does not contribute to an "exchange of information which culminates in a decision made by the patient. . . ." *Gauvey* at 439. La.Rev. Stat.Ann. § 40:1299.35.6(B)(6) is unconstitutional because it "is not reasonably related to the purpose of informed consent." *Freiman v. Ashcroft*, 584 F.2d 247, 251 (8th Cir. 1978), aff'd, 440 U.S. 941, 99 S.Ct. 1416, 59 L.Ed.2d 630 (1979).

■ *La.Rev.Stat.Ann. §§ 40:1299.35.-6(B)(7), (8):* These sections require the physician to inform the patient of available social services should the patent opt for childbirth instead of abortion. La.Rev.Stat. Ann. §§ 40:1299.35.6(B)(7), (8) are somewhat vague because they refer to unspecified "numerous public and private agencies" and "public mental health agencies." However, physicians can easily supply patients with standard printed material listing public social service agencies which offer assistance to women during pregnancy and after birth, located in the same area as the physician's office. The Court holds that providing information to patients concerning social services available to a pregnant woman or a recent mother is rationally related to the giving of an informed consent

describe a first trimester abortion done by suction aspiration as "something that carries a high risk" in which "an immediate life-threatening complication *would* occur, which would

require extensive surgical treatment" is inaccurate. Tietze Tr. at 110 (emphasis added). *See Roe,* 410 U.S. at 148–49, 93 S.Ct. at 724 (dis-

to undergo an abortion. Accordingly, the Court will sustain these sections.[95]

■ *La.Rev.Stat.Ann. §§ 40:1299.35.-6(C), (D):* The Court holds that these sections are reasonably related to the giving of an informed consent. Providing relevant information based on a physician's "own medical judgment," *see* La.Rev.Stat.Ann. § 40:1299.35.6(C), is essentially the definition of informed consent. Requiring the patient to sign the consent form protects both the patient and the physician. *See* La.Rev.Stat.Ann. § 40:1299.35.6(D). Except for the language used in both sections, "or one of her parents or legal guardian," *see* pp. 201–205, *supra,* the Court holds that La. Rev.Stat.Ann. §§ 40:1299.35.6(C), (D) are constitutional.

### WAITING PERIOD: LA.REV.STAT. ANN. § 40:1299.35.7 (WEST SUPP.1979)

This section[96] requires that a physician must wait at least twenty-four hours after the patient signs the required informed consent form before performing an abortion. The Court holds that this requirement places a significant and unconstitutional burden upon a woman's ability to obtain an abortion.

A twenty-four hour waiting period was upheld in *Wolfe v. Schroering,* 541 F.2d 523 (6th Cir. 1976). *Accord, Akron Center for Reproductive Health, Inc. v. Akron,* 479 F.Supp. at 1204–1205 (N.D.Ohio 1979). In *Wolfe* the Court of Appeals stated that "a delay of 24 hours could not result in a transition from the first into second trimester, or from the second trimester into 'via-bility.' . . . Nor do plaintiffs claim that the 24-hour waiting period significantly burdens the abortion process." 541 F.2d at 526 (citation omitted). However, this Court finds that plaintiffs in the instant case have proved that the Act's waiting period may result in such trimester shifts in a significant number of cases and will be unconstitutionally burdensome to the abortion process.

All reported abortions in Louisiana are performed either in Baton Rouge or New Orleans.[97] Eight per cent of the patients are from out of state.[98] A majority of the patients at the Delta Clinic in New Orleans are not from the city itself.[99] Because there are a limited number of doctors presently doing abortions in Louisiana, women are presently traveling significant distances to obtain them. To require women to wait an additional twenty-four hours will mean that many women will either have to stay over an extra day or have to make a second trip. In a significant number of cases, delays will be three to five days because of weekends and because some clinics are not open five days a week. Such delays could carry a woman into another trimester. Furthermore, even a twenty-four hour delay will increase the risk to a pregnant woman's health.[100] *Accord, Womens Services, P. C. v. Thone,* 483 F.Supp. 1022 at 1050 (D.Neb.1979) (With reference to a forty-eight hour waiting period, the Court found that "the increased risk [to a pregnant woman's health] to be substantial."); *Planned Parenthood Association of Kansas City, Missouri, Inc. v. Ashcroft,* 483 F.Supp. 679 at 696 (W.D.Mo.1980).

---

cussing data on safety of first trimester abortions); Crist Tr. at 16–17.

**95.** *Contra, Planned Parenthood Association of Kansas City, Mo., Inc. v. Ashcroft,* 483 F.Supp. 679 at 697 (W.D.Mo.1980).

**96.** La.Rev.Stat.Ann. § 40:1299.35.7 states:
No physician shall perform or induce an abortion upon a pregnant woman until twenty-four hours have elapsed from the time the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with R.S. 40:1299.35.5(B) herein, have signed the consent form required by R.S. 40:1299.35.6, and the physician so certifies in writing that such time has elapsed.

**97.** P. Ex. 34D.

**98.** P. Ex. 34B.

**99.** Cottle Tr. at 57–58 (between 60% and 70% of Delta's patients do not reside in New Orleans).

**100.** *See* nn.35 & 39, *supra.*

Access to the abortion procedure is a fundamental right. *Roe,* 410 U.S. at 154, 93 S.Ct. at 727. A regulation limiting this right may be justified only by a compelling state interest and must be narrowly drawn. *Roe,* 410 U.S. at 155, 93 S.Ct. at 727. Unlike the requirement of informed consent, the requirement of a waiting period "is a direct obstacle" to having an abortion. *Womens Services, P. C. v. Thone, supra,* at 1050; *Leigh v. Olson,* No. A3–79–78 (D.N.D. July 9, 1979) (order granting preliminary injunction), at 4. A mandatory delay [101] "means that, even after a decision to have an abortion has been made, irrespective of how carefully and thoughtfully, the woman must wait for [twenty-four] hours . . . . That is a burden." *Leigh, supra,* slip op. at 4. During the first trimester, "the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician." *Roe,* 410 U.S. at 164, 93 S.Ct. at 732. Once a woman has given her informed consent, her decision has been made. Apparently, the state interest is that a woman seeking an abortion should have time to consider her decision after signing the consent form. "While this may be legitimate, it is not sufficiently compelling to justify the burdens imposed by this direct obstacle to abortion." *Womens Services, P. C. v. Thone,* 483 F.Supp. at 1050. The Court therefore holds that La.Rev.Stat. Ann. § 40:1299.35.7 is an unconstitutional infringement upon a woman's ability to obtain an abortion, thus restricting the woman's constitutional right of privacy.

### RECORDS: LA.REV.STAT.ANN. § 40:1299.35.8 (WEST SUPP.1979)

This section [102] requires that essentially all of a doctor's paperwork, as well as all forms required by the Act, be kept by the doctor for seven years. The Court holds that the requirements of this section are vague, burdensome, and will have a "legally significant impact or consequence on the abortion decision [and] on the physician-patient relationship." *Danforth,* 428 U.S. at 81, 96 S.Ct. at 2846.

La.Rev.Stat.Ann. § 40:1299.35.8 differs significantly from the statute in *Danforth,* 428 U.S. at 79–81, 96 S.Ct. at 2845–2846, which required that state supplied health forms be kept for statistical purposes for seven years. The requirements of the Louisiana provision are more stringent: not only must doctors keep such statistical forms, they must also keep "records, including admission and discharge notes, histories, results of tests and examinations, nurses' work sheets, etc." No other medical or surgical procedure, in Louisiana, comparable or otherwise, is regulated in this fashion.

La.Rev.Stat.Ann. § 40:1299.35.8 is impermissibly vague because it fails to give a specific list of the documents which a doctor is required to keep. The "records" of a patient may be defined broadly, to include every scrap of paper and note taken, or narrowly, to include only the patient's chart and other formal documents. When attempting to comply with a criminal statute that begins with the word "including" and ends with the abbreviation "etc.", a doctor cannot safely determine what he may throw away and what he must keep in his workfile. The only limits placed on what records a doctor ought to keep are those of the local prosecutor's imagination. This is impermissible in a criminal statute.

Nor can the state justify this section by arguing that the doctor's work papers are necessary for statistical purposes.

---

101. The Court notes that La.Rev.Stat.Ann. § 40:1299.35.12 (West Supp.1979) provides an exception from the requirements of La.Rev.Stat.Ann. § 40:1299.35.7 in an emergency.

102. La.Rev.Stat.Ann. § 40:1299.35.8 states: All abortion facilities and hospitals in which abortions are performed or induced shall keep records, including admission and discharge notes, histories, results of tests and examinations, nurses' work sheets, etc. and shall further keep a copy of all written certifications herein provided for as well as a copy of records of constructive work consent forms, abortion records, and complication reports provided for in R.S. 40:1299.35.5, 1299.-35.6 and 1299.35.10. Such records shall be maintained in the permanent files of the abortion facility for a period of not less than seven years.

[M]aintenance of records indeed may be helpful in developing information pertinent to the preservation of maternal health.

. . . . .

. . . Recordkeeping of this kind, if not abused or overdone, can be useful to the State's interest in protecting the health of its female citizens, and may be a resource that is relevant to decisions involving medical experience and judgment.

*Danforth*, 428 U.S. at 80, 81, 96 S.Ct. at 2846 (footnote omitted).

However, the amalgam of charts, notes, worksheets, and patient histories in a typical patient's folder is not in any kind of order that would allow the data to be analyzed systematically. It is not gathered for that purpose. Rather, it is used to assemble information about a particular patient and may well include items revealed in strict confidence on subjects dealing only tangentially with the abortion procedure. Such data will be irrelevant to any State health survey. Knowledge that such intimate files, marked with her name, will be kept for seven years and will be open to inspection by the State at any time will have a negative impact on what a woman reveals to her doctor. Instead of giving him an accurate medical history, she might well hide previous abortions, past incidents of venereal disease, or other data about her sexual activity that might be embarrassing but extremely relevant to a doctor's treatment and advice. This is a clear constraint on the development of a candid doctor-patient relationship. Indeed, many women unwilling to risk disclosure of their names might not seek a legal abortion. *See, Wynn*, 449 F.Supp. at 1328. The Court holds that the requirement that all files on a patient be kept for inspection will have a significant impact on the abortion decision,

its effectuation, and upon the physician-patient relationship.

█ Furthermore, La.Rev.Stat.Ann. § 40:-1299.35.8 is a burden on the doctor's right to practice medicine. Keeping state supplied forms, perhaps two or three sheets per patient, that are anonymous, that can be compiled easily while taking the patient's history and that are directed solely towards a legitimate state interest, such as protection of maternal health, may fall within the limits of permissible state regulation. *Wynn*, 449 F.Supp. at 1328. However, requiring that a doctor keep all papers on which he has ever scratched a note about a patient, and keep them intact for seven years, as office space and personnel change, will "accomplish, through the sheer burden of recordkeeping detail, what [the Supreme Court has] held to be an otherwise unconstitutional restriction." *Danforth*, 428 U.S. at 81, 96 S.Ct. at 2047. It will not only prevent doctors from purging their files of irrelevant papers so that storage will be less cumbersome, it will also force those who wish to protect their patients' privacy to separate a long term patient's "abortion" record from her "regular" record. This task may be impossible if the abortion takes place in conjunction with some other procedure, such as a hysterectomy. Even where it is possible, it will require a doctor to keep duplicate records on every patient which will cost the doctor, and eventually the patient, additional money for duplication, cross-referencing, storage, and personnel. The Court therefore holds that La.Rev.Stat. Ann. § 40:1299.35.8 is an unconstitutional burden on both a doctor's right to practice medicine and a woman's right of privacy.

### INSPECTION: LA.REV.STAT.ANN. § 40:1299.35.9 (WEST SUPP.1979)

This section [103] requires that both medical records and abortion facilities shall be open

---

**103.** La.Rev.Stat.Ann. § 40:1299.35.9 states:

A. The medical records and the physical facilities of all abortion facilities and hospitals in which abortions are performed shall be open to inspection at any time by the Department of Health and Human Resources for purposes of gathering statistical data and in-

suring compliance with the provisions of R.S. 40:1299.35.1–40:1299.35.18.

B. The medical records of abortion facilities and hospitals in which abortions are performed and all information contained therein shall remain confidential and shall be used by the Department of Health and Human Re-

for inspection at any time by the Department of Health and Human Resources and that the department must inspect all such locations at least once every six months. It further provides that the medical records shall remain confidential. Abortion facilities include clinics, physician's offices, or any other place or facility where an abortion is performed. The Court holds that this section violates the Fourth Amendment:

> The basic purpose of the [Fourth] Amendment, as recognized in countless decisions of [the Supreme] Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials. The Fourth Amendment thus gives concrete expression to a right of the people which "is basic to a free society."
>
> . . . . .
>
> . . . [O]ne governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant.
>
> *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930 (1967) (citations omitted) (housing code inspection).

This principle applies whether the property is residential or commercial. *Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (OSHA inspections) (*Marshall*); *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967) (fire inspection). The Supreme Court explained:

If the government intrudes on a person's property, the privacy interest suffers whether the government's motivation is to investigate the violations of criminal laws or breaches of other statutory or regulatory standards. It therefore appears that unless some recognized exception to the warrant requirement applies, *See v. City of Seattle, supra,* would require a warrant to conduct the inspection sought in this case.

*Marshall,* 436 U.S. at 312–13, 98 S.Ct. at 1820.

Defendants assert that the recognized exception for "pervasively regulated business[es]" applies to abortion facilities. *United States v. Biswell,* 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972). Defendants contend that abortion facilities are part of an industry with "such a history of government oversight that no reasonable expectation of privacy . . . could exist for [the] proprietor . . . ." *Marshall,* 436 U.S. at 313, 98 S.Ct. at 1821 (citation omitted). The Supreme Court in *Marshall* cited liquor and firearms as two industries in which a businessman "has voluntarily chosen to subject himself to a full arsenal of governmental regulations." *Marshall,* 436 U.S. at 313, 98 S.Ct. at 1821.

At first, defendant's argument sounds persuasive when applied to the medical profession. The State regulates the initial licensing of doctors[104] and various health facilities.[105] The State conducts some inspections.[106] The practice of medicine is a privilege and that privilege may be revoked for any number of reasons, ranging from habitual drunkenness to repeated overcharging of patients. La.Rev.Stat.Ann.

---

sources only for the purposes set forth in Paragraph A of this Section.

C. Licensing workers of the Department of Health and Human Resources shall physically inspect all abortion facilities at least once every six months to insure compliance with the provisions of R.S. 40:1299.35.1 through 40:1299.35.18 and all laws of the state of Louisiana and its respective political subdivisions concerning health and sanitation.

**104.** La.Rev.Stat.Ann. § 37:1261 *et seq.* (West 1974 & West Supp.1979).

**105.** La.Rev.Stat.Ann. § 40:2009.3(D)–.35, :2103 (A), (B), :2135, :2139(B) (West 1977 & West Supp.1979). *See* Plaintiffs' Statement of Facts, at 145.

**106.** La.Rev.Stat.Ann. § 40:2137(B) (West 1977) (ambulatory surgical centers); La.Rev.Stat. Ann. § 40:2009.8 (West 1977) (nursing homes). Note the extensive procedure for evaluating complaints against nursing homes, La.Rev.Stat. Ann. § 40:2009.13–.19 (West Supp.1979).

§§ 37:1285(4), (16) (West Supp.1979). Physicians would seem to be much more closely regulated than the electrical and plumbing installation business discussed in *Marshall.*

Closer examination, however, reveals flaws in defendant's argument. Physicians, surgeons, and midwives are actually self-regulated. Their licensing board, the Louisiana State Board of Medical Examiners, is composed of members "appointed by the governor from a list of names recommended by the Louisiana State Medical Society and the Louisiana Medical Association." La. Rev.Stat.Ann. § 37:1263(B) (West Supp. 1979). Both of these organizations are private, self-perpetuating bodies. Nor can the fact that the state requires a license to practice be dispositive since Louisiana demands a license for over thirty occupations.[107] Nor can it be sufficient to argue that the State has a clear interest in protecting its citizens' health through insuring compliance with the Act:

> [I]t is vigorously argued that the health and safety of entire urban populations is dependent upon enforcement of minimum fire, housing, and sanitation standards, and that the only effective means of enforcing such codes is by routine, systematized inspection of all physical structures. Of course, in applying any reasonableness standard, including one of constitutional dimension, an argument that the public interest demands a particular rule must receive careful consideration. But we think this argument misses the mark. The question is not, at this stage at least, whether these inspections may be made, but whether they may be made without a warrant. . . . [W]hether the authority to search should be evidenced by a warrant . . . depends in part upon whether the burden of obtaining the warrant is likely to frustrate the governmental purpose behind the search.

*Camara,* 387 U.S. at 533, 87 S.Ct. at 1733.

Inspections designed to insure compliance with this section and to collect statistics do not seem to fall into the category of "prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations." *Camara,* 387 U.S. at 539, 87 S.Ct. at 1736. It is questionable whether unsanitary conditions, poorly trained personnel, and lack of proper equipment are "amenable to speedy alteration or disguise." *Marshall,* 436 U.S. at 316, 98 S.Ct. at 1822. However, even if they are, "it [is not] immediately apparent why the advantage of surprise would be lost if, after being refused entry, procedures were available for the [agency] to seek an *ex parte* warrant and to reappear at the premises without further notice to the establishment being inspected." *Marshall,* 436 U.S. at 319–20, 98 S.Ct. at 1824. The State has a legitimate interest in reviewing records or in inspecting facilities, "[b]ut the decision to enter and inspect [should] not be the product of the unreviewed discretion of the enforcement officer in the field." *See v. City of Seattle,* 387 U.S. at 545, 87 S.Ct. at 1740.

It is evident that the threat to privacy is of impressive dimensions, affecting both the doctor and his patient. Doctors have a reasonable expectation that their offices and files are private. The medical profession, unlike the liquor industry, has no "long history" of warrantless state inspection. *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 75–76, 90 S.Ct. 774, 776–77, 25 L.Ed.2d 60 (1970) (emphasizing detection of revenue fraud and seizure of stolen goods). Nor is the practice of medicine an industry in which heavy regulation is crucial to assure careful distribution of dangerous weapons, as in the firearms industry. *United States v. Biswell,* 406 U.S. at 315–16, 92 S.Ct. at 1596 (emphasizing prevention of crime). Rather, it is a profession with a history of respect towards the recognized need for privacy in the doctor-patient relationship. Communications with patients, including records, are privileged and may not be disclosed to any third party without the patient's express consent. La.Rev.Stat.Ann. § 13:3734(B) (West Supp. 1979); La.Rev.Stat.Ann. § 15:476 (West

---

**107.** See generally, La.Rev.Stat.Ann. § 37:1 et seq. (West 1977 & West Supp.1979). Among those required to obtain a license are retail florists and barbers.

1967). A patient feels free to reveal data to a doctor only because she knows that it will not be revealed to *anyone* without her permission. Absent such a guarantee of privacy, doctors and their patients cannot realize the desired result of consultation: a discussion free of restraint. The Court finds that the health industry in Louisiana is not a closely regulated industry within the meaning of *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). Therefore, the Court holds that La.Rev. Stat.Ann. § 40:1299.35.9 violates the Fourth Amendment because it authorizes warrantless inspections. *Accord, Akron Center for Reproductive Health, Inc. v. Akron*, 479 F.Supp. at 1205 (N.D.Ohio 1979).

REPORTING: LA.REV.STAT.ANN. § 40:1299.35.10 (WEST SUPP.1979)

A.

Paragraph A of this section [108] requires that doctors submit an abortion report on each patient to the Department of Health and Human Resources. Such reports have been upheld when the patient's confidentiality is protected. "The acquisition of data is essential to the advancement of medical knowledge. These provisions establish reporting procedures for statistical purposes only . . . ." *Planned Parenthood of Cent. Mo. v. Danforth*, 392 F.Supp. 1362, 1374 (E.D.Mo.1975), *aff'd in part, rev'd in part and remanded*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). The Su-

preme Court in *Danforth* rejected the argument that such reports are improper because they "significantly differ from those imposed with respect to other, and comparable, medical or surgical procedures," *Danforth*, 428 U.S. at 80–81, 96 S.Ct. at 2846. The fact that several items of data are required is not enough to render the list unconstitutionally burdensome. "The information can be assembled quickly and recorded on forms." *Wynn v. Scott*, 449 F.Supp. 1302, 1327 (N.D.Ill.1978), *aff'd sub nom. Wynn v. Carey*, 599 F.2d 193 (7th Cir. 1979). Examination of the forms presently used at two of the plaintiff clinics indicate that almost all the information is already being collected.[109]

■ The only problem presented in La. Rev.Stat.Ann. § 40:1299.35.10(A) is its requirement that doctors provide the "[z]ip code or residence of [the] pregnant woman." La.Rev.Stat.Ann. § 40:1299.35.-10(A)(4) (West Supp.1979). At least one other court has confined "legal residence" to "the city and county of the woman's residence and not the street address". *Wolfe v. Schroering*, 388 F.Supp. 631, 638 (W.D.Ky.1974) *aff'd in part, rev'd in part*, 541 F.2d 523 (6th Cir. 1976). This Court will also adopt that construction since it is logically supported by the legislature's rule that the report is confidential. With this one restraint, therefore, La.Rev.Stat.Ann. § 40:1299.35.10(A) does not infringe on any

108. La.Rev.Stat.Ann. § 40:1299.35.10(A) states: An individual abortion report for each abortion performed or induced upon a woman shall be completed by her attending physician. The report shall be confidential and shall not contain the name of the woman. This report shall include:
(1) Patient number
(2) Name and address of the abortion facility or hospital
(3) Date of abortion
(4) Zip code or residence of pregnant woman
(5) Age of pregnant woman
(6) Race
(7) Marital status
(8) Number of previous pregnancies
(9) Educational background
(10) Number of living children
(11) Number of previous induced abortions
(12) Date of last induced abortion
(13) Date of last live birth
(14) Method of contraception at time of conception
(15) Date of beginning of last menstrual period
(16) Medical condition of woman at time of abortion
(17) Rh type of pregnant woman
(18) Type of abortion procedure
(19) Complications of type
(20) Type of procedure done after the abortion
(21) Type of family planning recommended
(22) Type of additional counseling given
(23) Signature of attending physician
(24) The certifications provided for in this Chapter.

109. P. Ex. 5, 21.

right of either the doctor or his patient. *But see Doe v. Zimmerman*, 405 F.Supp. 534, 540 (M.D.Pa.1975) (holding unconstitutional the entire section of a statute which required the name and address of the woman who obtained an abortion be kept); *Doe v. Rampton*, 366 F.Supp. 189, 193 (D.Utah 1973) (reporting requirements, including woman's "residence" chilled right of privacy).

### B.

Contrary to plaintiffs' assertion,[110] paragraph B of La.Rev.Stat.Ann. § 40:1299.35.10 [111] does not require that all physicians who perform abortions complete complication reports as well as abortion reports. The physician who treats a patient's complications may or may not be the same one who performed the abortion.[112] Although other health care *facilities* may not be required to report similar information, *physicians*, to whom La.Rev.Stat.Ann. § 40:1299.35.10(B) is addressed, are.[113] The reports will be simple to make and do not reveal the woman's name. Because the reports do not contain any personal information about the woman, it is difficult to see how La. Rev.Stat.Ann. § 40:1299.35.10(B) will have any affect on a woman's decision to have an abortion or her ability to obtain one.

Since La.Rev.Stat.Ann. § 40:1299.35.10(B) does not infringe on any fundamental right, the Court must analyze the section using the less stringent rationale relationship test. This requirement is not readily distinguishable from other reporting requirements related to the State's interest in health. Reports on complications will provide data on the occurrence of specific risks and help the State to pinpoint those doctors and clinics whose patients are suffering an unusual number of complications.[114] By isolating those doctors who are abusing their professional privileges, the State will be able to take steps to protect its citizens. The Court finds that La.Rev. Stat.Ann. § 40:1299.35.10(B) is rationally related to the State's interest in health and is therefore constitutional.

### C.

La.Rev.Stat.Ann. § 40:1299.35.10(C) [115] requires that doctors sign their abortion and complication reports. This requirement is hardly a burden of constitutional dimensions. La.Rev.Stat.Ann. § 40:1299.35.10(D) [116] requires that the abortion report be made a part of the woman's medical record. This is standard medical procedure. There is no infringement on any privacy interest of the woman because medical records are confidential. There has been no challenge to La.Rev.Stat.Ann.

---

110. Plaintiffs' Statement of Facts, at 117.

111. La.Rev.Stat.Ann. § 40:1299.35.10(B) states: An individual complication report for any post-abortion care performed upon a woman shall be completed by the physician providing such post-abortion care. The report shall include:
(1) The date of the abortion.
(2) The name and address of the abortion facility or hospital where the abortion was performed.
(3) The nature of the abortion complication diagnosed or treated.

112. The most common complication, infection, does not become evident until two or three days after the abortion.

113. *See* La.Rev.Stat.Ann. § 40:1093 (West 1977) (births and stillbirths); La.Rev.Stat.Ann. § 40:1065 (West Supp.1979) (venereal disease); La.Rev.Stat.Ann. § 40:1102 (West Supp.1979) (opthalmia neonatorum); La.Rev.Stat.Ann. § 40:1299.1 (West Supp.1979) (sickle cell ane-

mia, phenylketonuria, congenital hypothroidism).

114. *See* Tietze Tr. at 132.

115. La.Rev.Stat.Ann. § 40:1299.35.10(C) states: All abortion reports shall be signed by the attending physician and submitted to the Department of Health and Human Resources within thirty days after the date of the abortion. All complication reports shall be signed by the physician providing the post-abortion care and submitted to the Department of Health and Human Resources within thirty days after the date of the completion of the post-abortion care.

116. La.Rev.Stat.Ann. § 40:1299.35.10(D) states: "A copy of the abortion report shall be made a part of the medical report of the patient of the facility or hospital in which the abortion was performed."

§ 40:1299.35.10(E) [117] which requires that the Department of Health and Human Resources be responsible for collection of various forms and compilation of an annual report.

### EXPERIMENTATION: LA.REV.STAT. ANN. § 40:1299.35.13 (WEST SUPP.1979) [118]

This section states: "No person shall experiment upon or sell a live child or unborn child unless such experimentation is therapeutic to the child or unborn child." La. Rev.Stat.Ann. § 40:1299.35.13 (West Supp. 1979). The plaintiffs have challenged this section as unconstitutionally vague and allege that it burdens the doctors' right to practice medicine or do medical research. The Court finds that these arguments are not supported by the evidence.

Although plaintiffs do not contest the section's prohibition against the sale of live children, they argue that the section's wording will inhibit many legitimate private adoptions in which certain maternity fees may be paid. This fear is ungrounded, however, because La.Rev.Stat.Ann. § 14:286 (B) (West Supp.1979) specifically excludes such maternity fees from its own prohibition against the sale of minor children.

Plaintiffs further contend that the section is so vague that it will inhibit valuable medical experimentation and preclude the use of certain procedures, such as amniocentesis and fetal fluoroscopy. This is a legitimate concern worthy of careful consideration. "[I]ndividual States have broad latitude in experimenting with possible solutions to problems of vital local concern." *Whalen v. Roe*, 429 U.S. 589, 597, 97 S.Ct. 869, 875, 51 L.Ed.2d 64 (1977). This is especially so where matters of social policy, such as health regulations are involved, *Whalen*, 429 U.S. at 597, 97 S.Ct. at 875, and "whether or not [the Court believes it to be] wise. . . . ." *Wynn v. Scott*, 449 F.Supp. 1302, 1322 (N.D.Ill.1978), *aff'd sub nom. Wynn v. Carey*, 599 F.2d 193 (7th Cir. 1979). On the other hand, a criminal statute must be carefully scrutinized where allegations of vagueness have been raised. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *Connally v. General Const. Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).[119]

This section precludes experimentation which is not "therapeutic." Does this wording sweep so broadly that doctors will be unable to conduct tests or perform operations merely because there is a chance that the patient may be harmed or fail to benefit? The Court finds that this question must be answered in the negative. Therapeutic is defined as "of or relating to the treatment of disease or disorders by remedial agents . . . ." Webster's Third New International Dictionary 2372 (1976) (hereinafter cited Webster's); *see also* Dorland's Illustrated Medical Dictionary 1597 (25th ed. 1974) (hereinafter cited Dorland's). Remedial, in turn, is defined as ". . . *intended* for a remedy or for the removal or abatement of a disease or of an evil . . ." Webster's at 1920 (emphasis added); *see also* Dorland's at 1343. Since experimentation itself involves the chance of failure, the legislature could not have meant that only *successful* experimentation would be therapeutic or it would have said so. The legislature must have meant that it wished to permit only experimentation that is designed to benefit, either in the short or the long term, the individual upon whom it is conducted.[120] Regardless of whether he can

---

**117.** La.Rev.Stat.Ann. § 40:1299.35.10(E) states: "The Department of Health and Human Resources shall be responsible for collecting all abortion reports and complication reports and collating and evaluating all data gathered therefrom, and shall annually publish a statistical report based on such data from abortions performed in the previous calendar year."

**118.** Plaintiffs did not challenge La.Rev.Stat. Ann. § 40:1299.35.11 (Forms) or La.Rev.Stat. Ann. § 40:1299.35.12 (Emergency).

**119.** *See* n.18, *supra*. *See also*, Note, *The Void-for-Vagueness Doctrine in the Supreme Court*, 109 U.Pa.L.Rev. 67, 88 (1960).

**120.** *See* 45 C.F.R. § 46.102(a), (b), (c); .201–11 (1979). Whether the State can prohibit all non-

calculate the odds of success, a doctor knows whether an experiment is intended to help a patient. If it is so intended, then it is therapeutic. The Court holds that "therapeutic" is not "so indefinite that the line between innocent and condemned conduct becomes a matter of guesswork." L. Tribe, American Constitutional Law at 718 (1978). Rather, it is possible, by a "reasonable construction of the Statute," *United States v. Harriss*, 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954), to uphold the constitutionality of La.Rev.Stat.Ann. § 40:-1299.35.13.

Plaintiffs have also suggested that this section will burden medical researchers. "[T]he rights of medical researchers are not fundamental under the Constitution . . . .", *Wynn v. Scott*, 449 F.Supp. 1302, 1322 (N.D.Ill.1978), aff'd sub nom. *Wynn v. Carey*, 599 F.2d 193 (7th Cir. 1979).[121] This is true especially when the experiments involved are to be done on minors [122] and fetuses [123] and are *designed* to be non-therapeutic. The Court notes that this section will not proscribe important medical procedures such as amniocentesis.[124] Amniocentesis is not a therapeutic

therapeutic human experimentation is open to question. Rational adults, capable of informed consent, may wish to participate in experiments or to engage in occupations harmful to their health for many reasons: money, fame, idealism, or, in the case of prisoners, the hope of freedom. *See*, for example, B. A. Franklin, Nuclear Plants Hiring Stand-Ins to Spare Aides Radiation Risks, *N. Y. Times*, July 16, 1979, at A1, Col. 5. The decision in favor of danger may be a thoughtful part of a desire "to shape a life—to plan its pattern and its style—at a higher than ordinary level of risk." TRIBE, at 938. An activity such as being a guinea pig for a dangerous drug can surely be as "expressive" as refusing to wear a motorcycle helmet or demanding the right to have access to saccharin. *Id.* at 940.

**121.** *But cf.* Comment, *Considerations in the Regulation of Biological Research*, 126 U.Penn. L.Rev. 1420, 1427–35 (1978); Davidson, *First Amendment Protection for Biomedical Research*, 19 Ariz.L.Rev. 893, 899 (1977), "[t]he right to know of and make public scientific advancements and discoveries depends upon the right to do research, just as newsgathering is an activity without which the right to a free press would be ineffectual." (footnote omitted).

**122.** Note, however, that Louisiana minors can give their consent to treatment, including presumably, experimental methods thereof, under La.Rev.Stat.Ann. § 40:1095 (West 1977).

**123.** Plaintiffs have made a strenuous attack on the statute on the grounds that it will prevent scientific research which depends on live fetal tissue. However, § 40:1299.35.13 does not prohibit experimentation on fetal tissue, as did the statute in *Wynn v. Scott*, 449 F.Supp. at 1322 ("no exploitation of or experimentation with the aborted tissue"). The Louisiana statute deals with fetuses while they are still *in utero.* Compare the instant section with *Wolfe v. Schroering*, 388 F.Supp. 631, 638 (W.D.Ky. 1974) aff'd in part, rev'd in part, 541 F.2d 523

(6th Cir. 1976) ("any person who sells or otherwise transfers or permits any form of experimentation on a viable aborted child").

**124.** Amniocentesis is a procedure in which fluid is withdrawn from the amniotic sac of a pregnant woman. Cells in the fluid, shed by the fetus, can be tested for about sixty hereditary disorders. L. K. Altman, *Birth-Defect Suits Worry Doctors, N. Y. Times*, January 30, 1979, § C, at 2, col. 2. It is a technique used increasingly in the field of genetic counseling where fetuses are at risk because of such factors as the mother's age (Down's Syndrome) or family history (Tay-Sachs disease). Without it many women would be less able to determine whether or not to terminate a pregnancy since it may provide the fundamental information they require to make an intelligent decision.

Amniocentesis has become so much a part of medicine that failure to advise a woman that she is at risk, and amniocentesis is available, has been held to constitute malpractice, *Becker v. Schwartz*, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978), as has negligent performance of amniocentesis, *Gilidner v. Thomas Jefferson U. Hospital*, 451 F.Supp. 692, 696 (E.D.Pa.1978) ("Society has an interest in insuring that genetic testing is properly performed and interpreted") (Tay-Sachs disease). *Compare Berman v. Allan*, 80 N.J. 421, 404 A.2d 8 (1979), and *Karlsons v. Guerinot*, 57 A.D.2d 73, 394 N.Y.S.2d 933 (1977) (upheld action for emotional distress where physician failed to advise at-risk mother of availability of amniocentesis) *with Howard v. Lecher*, 53 A.D.2d 420, 386 N.Y.S.2d 460, aff'd 42 N.Y.2d 109, 397 N.Y.S.2d 363, 366 N.E.2d 64 (1977) (dismissing same claims). *See also Park v. Chessin*, 88 Misc.2d 222, 387 N.Y.S.2d 204 (1976), aff'd 60 A.D.2d 80, 400 N.Y.S.2d 110 (1977) (failure to warn about possible birth defect).

Amniocentesis is not completely risk-free. While usually safe and accurate, "the needle can damage the fetus or lead to miscarriages or bleeding." *Altman, supra.*

procedure for those fetuses which are defective since discovery of a serious defect will presumably lead to their death *via* abortion. Neither, is it an experiment upon a fetus. It is a *test*[125] as for diabetes or pregnancy or night blindness, rather than an experiment.[126] Doctors do not experiment upon people when they conduct such routine tests. Amniocentesis is used to discover certain inherent defects of a fetus. Physicians recognize the uses of this procedure, its limits, and its risks to both the mother and the fetus. If amniocentesis is not an experiment, La.Rev.Stat.Ann. § 40:1299.35.-13 will be inapplicable. No obstacle has been placed in the path of the woman seeking an abortion or of her doctor. Furthermore, neither doctors nor women seeking abortions need non-therapeutic[127] *in utero* experimentation in order to decide upon or to effectuate an abortion. Therefore, plaintiff's argument that this section intrudes upon a woman's fundamental right of privacy is without merit.

 Since this provision does not infringe on a fundamental right, it is subject to the less demanding test of rationality. Statutes regulating human experimentation and *in utero* fetal experimentation are a reasonable exercise of the State's police powers. Given the dangers of abuse inherent in any rapidly developing field, it is

rational for a State to act to protect the health and safety of its citizens. The Court notes that several states have joined Louisiana in regulating this area.[128] The Court holds that La.Rev.Stat.Ann. § 40:1299.35.13 is rationally related to the promotion of a legitimate state interest, and La.Rev.Stat. Ann. § 40:1299.35.13 is therefore constitutional.

### DISPOSAL OF REMAINS: LA.REV. STAT.ANN. § 40:1299.35.14 (WEST SUPP.1979)

This section[129] provides: "Any physician who shall perform or induce an abortion . . . shall insure that the remains of the unborn child are disposed of in a manner consistent with the disposal of other human remains as provided by [the Human Remains section of the Cemetery Title]." La.Rev.Stat.Ann. § 40:1299.35.14. The Human Remains section requires: "[E]very dead body of a human being lying within this state, and the remains of any dissected body, after dissection, shall be decently interred or cremated within a reasonable time after death." La.Rev.Stat.Ann. § 8:651 (West Supp.1979).[130] The Court recognizes that "the state in the constitutional exercise of its police power may provide for the disposition of dead fetuses to protect the public health." *Planned Parenthood Ass'n.*

---

**125.** Test is defined as "an act or process that reveals inherent qualities." Webster's Third New International Dictionary 2361 (1976).

**126.** Experiment is defined as "a tentative procedure . . . adopted in uncertainty as to whether it will answer the desired purpose or bring about the desired result." Webster's Third New International Dictionary 800 (1976).

**127.** Whether "therapeutic" is broader or narrower than "to preserve the life or to improve the health of said human embryo or fetus" is not properly before this Court at the present time. *See* La.Rev.Stat.Ann. § 14:87.2 (West 1974) (forbidding most fetal and non-consensual human experimentation).

**128.** *See* Ill.Ann.Stat. Ch. 38, § 81–32 (Smith-Hurd Supp.1977); Ind.Code Ann. § 35–1–58. 5–6 (Burns 1979); S.D. Compiled Laws Ann. § 34–23A–17 (Smith Supp.1976); Utah Crim. Code Ann. § 76–7–310 (Smith 1977). *See also* 45 C.F.R. §§ 46.201–211 (1979).

**129.** La.Rev.Stat.Ann. § 40:1299.35.14 states: "Any physician who shall perform or induce an abortion upon a pregnant woman shall insure that the remains of the unborn child are disposed of in a manner consistent with the disposal of other human remains as provided by R.S. 8:651 through 8:662."

**130.** La.Rev.Stat.Ann. § 8:651 (West Supp.1979) requires that all dead bodies be "decently interred or cremated . . . ." Interment is defined as "cremation and inurnment, entombment or burial in a place used or intended to be used, and dedicated, for cemetery purposes." La.Rev.Stat.Ann. § 8:1(26) (West Supp.1979). Cremation is defined as "the reduction of the body of a deceased person to cremated remains in a crematory." La.Rev.Stat.Ann. § 8:1(15) (West Supp.1979). A crematory is any building "with one or more retorts for the reduction of bodies . . . to cremated remains." La. Rev.Stat.Ann. § 8:1(16) (West Supp.1979).

*v. Fitzpatrick*, 401 F.Supp. 554, 573 (E.D.Pa. 1975), *aff'd sub nom. Franklin v. Fitzpatrick*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976). However, this Court holds that La.Rev.Stat.Ann. § 40:1299.35.14 is an unconstitutional exercise of the State's police power, because it requires that fetal remains be treated with the same dignity as the remains of a person, and thereby, unduly burdens the right of a woman to obtain an abortion.

*Roe v. Wade* prohibited the State from making a determination as to when life begins, 410 U.S. at 159–62, 93 S.Ct. at 729–31, and held that "the word 'person,' as used in the Fourteenth Amendment, does not include the unborn." 410 U.S. at 158, 93 S.Ct. at 729. "Since the fetus is not a person," *Poe v. Gerstein*, 517 F.2d 787, 796 (5th Cir. 1975) (citing *Roe*, 410 U.S. at 156–58, 93 S.Ct. at 728–29), neither is it a human being.[131] However, La.Rev.Stat.Ann. § 40:1299.35.14 impermissibly raises the status of a fetus to that of a human being by using language equating fetal remains with human remains: "the remains of the unborn child are disposed of in a manner consistent with the disposal of *other human remains* . . ." (emphasis added). The equation of human and fetal status becomes more pronounced when the section at bar is read in conjunction with the provisions of the Human Remains section, which repeatedly refers to "the dead body of a human being," La.Rev.Stat.Ann. § 8:653 (West Supp.1979), or "the remains of a deceased person," La.Rev.Stat.Ann. § 8:655 (West Supp.1979).

Moreover, the legislative scheme requires that the parents of the fetus select between burial and cremation. La.Rev. Stat.Ann. § 8:655(3) (West Supp.1979). Forcing parents of the fetus to make such a choice is constitutionally impermissible because of the impact upon the pregnant woman's right to obtain an abortion. La. Rev.Stat.Ann. § 40:1299.35.14 incorporates by reference other provisions of La.Rev. Stat.Ann. §§ 8:651 *et seq.* dealing with human remains. Although the mandate of the section at bar is directed to the physician, La.Rev.Stat.Ann. § 8:655 (West Supp. 1979) states:

> The right to control the disposition of the remains of a deceased person, unless other directions have been given by the decedent, vests in and devolves upon the following in the order named:
>
> (1) The surviving spouse, if not judicially separated from the decedent;
>
> (2) The surviving children of the decedent;
>
> (3) *The surviving parents of the decedent;*
>
> (4) The surviving brothers and sisters of the decedent.
>
> (emphasis added).

Thus, reading the section at bar in conjunction with the above quoted statute, the physician performing the abortion would be forced to ask the woman[132] seeking an abortion whether the fetal remains should be buried or cremated. Such a question equates the abortion process with the taking of a human life, because fetal remains are required to undergo the same elaborate formalities of burial or cremation which are traditionally reserved for deceased persons.

---

**131.** A person is defined as "an individual human being . . . a human being as distinguishable from an animal or thing . . .," Webster's Third New International Dictionary 1686 (1976).

**132.** The Court notes that La.Rev.Stat.Ann. § 8:653(3) (West Supp.1979) presents another issue because it states that the right to dispose of the remains vests in both parents. Seeking the father's direction as to the disposal of fetal remains after the abortion might "invade the privacy of the pregnant woman and burden her decision concerning an abortion," *Planned Parenthood Ass'n v. Fitzpatrick*, 401 F.Supp. 554,

573 (E.D.Pa.1975), *aff'd sub nom., Franklin v. Fitzpatrick*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976), as much as requiring the father to be informed *before* the abortion that the pregnant woman is seeking an abortion. *See Planned Parenthood Ass'n of Cent. Mo. v. Danforth*, 428 U.S. 52, 67–72, 96 S.Ct. 2831, 2840–2842, 49 L.Ed.2d 788 (1976). However, it is unnecessary for this Court to decide this issue because the legislative scheme of La.Rev. Stat.Ann. § 40:1299.35.14 (West Supp.1979) which incorporates La.Rev.Stat.Ann. § 8:653(3) (West Supp.1979) is unconstitutional.

This question concerning funeral arrangements creates the same psychological burden on a pregnant woman feared by plaintiffs in *Planned Parenthood Ass'n. v. Fitzpatrick,* 401 F.Supp. at 573. Thus, the legislative scheme of La.Rev.Stat.Ann. § 40:1299.35.14 would have a chilling affect on a woman's right to obtain an abortion and represents an impermissible attempt of the State to influence a woman's abortion decision.

## LICENSING: LA.REV.STAT.ANN. §§ 40:1299.35.16, .17 (WEST SUPP.1979) [133]

La.Rev.Stat.Ann. § 40:1299.16 of the Act requires that all abortion facilities shall be licensed by the Louisiana Department of Health and Human Resources. La.Rev. Stat.Ann. § 40:1299.35.17 sets forth detailed standards for licensing, requiring that each abortion facility have specified drugs and equipment on hand. Further, the licensing standards section requires that all abortion facilities shall provide emergency transportation capable of transporting patients to hospital emergency rooms within fifteen minutes. The requirements imposed by these sections apply to all abortion facilities and all abortion procedures, without regard to the trimester of pregnancy when the abortion is performed. The Court holds that these two sections are unconstitutional because they are an attempt by the State to regulate abortion procedures before the State's interest in maternal health becomes compelling.

In considering the sections at bar, the Court is guided by the following language from *Roe v. Wade* :

**133.** La.Rev.Stat.Ann. § 40:1299.35.16 states:
All abortion facilities shall be licensed by the Department of Health and Human Resources before commencing operation. The license shall be renewable annually, and shall be granted or renewed only after certification that the facility has met the following standards as well as complied with the provisions enumerated in R.S. 40:1299.35.1 through 40:1299.35.15 above.
La.Rev.Stat.Ann. § 40:1299.35.17 states:
An annual fee of one thousand dollars shall be paid by each abortion facility applying for licensure under the provisions R.S. 40:1299.-35.1 through 40:1299.35.18. An additional fee of five hundred dollars shall be paid for each physician employed in performing or inducing abortions at an abortion facility.
B. All facilities, equipment and supplies shall be maintained in proper working order. Necessary solutions, drugs, and medications shall be supplied and maintained. All equipment shall be maintained in a clean and sanitary condition.
C. There shall be available on the premises an emergency transportation service or arrangements with a private ambulance service insuring that a patient requiring emergency care at a hospital will be transported to such hospital within fifteen minutes from the time of diagnosis at the abortion facility of a complication requiring emergency care at a hospital.
D. There shall be on the premises a clinical laboratory certified to perform urinalysis, hematocrit, and other hematological tests, including cross matching and determination of blood and Rh type.
E. There shall be on the premises a standard operating room, capable of accommodating abdominal as well as vaginal surgical procedures, or a written agreement with a hospital located within fifteen minutes total transport time for the use of a standard operating room in the treatment of its patients requiring such surgical procedure.
F. All rooms in which abortions are performed shall be adequately equipped, supplied and staffed and shall include the following in addition to the instruments and equipment needed for the performance of abortions or other comparable surgical procedures:
1. Anesthesia equipment and such other equipment as is necessary to treat patients for hemorrhage, shock, cardiac arrest, and other emergencies.
2. An adequate supply of drugs, plasma expanders, and parenteral fluids with appropriate refrigerant equipment therefor.
3. Available Rho (L) immune globulin for use when indicated, or the procedure to prevent Rh sensitization.
4. Dressing rooms and scrub-up facilities suitably located.
G. There shall be an adequately sized separate recovery room or rooms in proximity to the operating facilities and containing adequate monitoring equipment, suction, oxygen, and other related equipment for resuscitation, including a defibrilator, and staffed by a registered professional nurse.
H. At least one registered nurse shall be on duty at all times while the facility is in use.
I. There shall be a receiving facility where the patient may be prepared and receive necessary preoperative medication and observation prior to surgery.

With respect to the State's important and legitimate interest in the health of the mother, *the "compelling" point,* in the light of present medical knowledge, *is at approximately the end of the first trimester. . . .* It follows that, *from and after this point, a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health.* Examples of permissible state regulation in this area are requirements as to the qualifications of the person who is to perform the abortion; as to the licensure of that person; as to the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status; as to the licensing of the facility; and the like. This means, on the other hand, that, *for the period of pregnancy prior to this "compelling" point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated. If that decision is reached, the judgment may be effectuated by an abortion free of interference by the State.* Roe, 410 U.S. at 163, 93 S.Ct. at 731–32 (emphasis added).

This language demonstrates that only after the first trimester may a state enact regulations reasonably related to the protection of maternal health. In a decision reviewing licensing requirements, the Seventh Circuit Court of Appeal held that regulations similar to the instant sections were unconstitutional. Commenting on the meaning of the *Roe v. Wade* quotation cited above, the Seventh Circuit concluded:

> If there was any doubt as to whether the Supreme Court was declaring broad health and safety regulations for first trimester abortions impermissible, it was cleared up by the Court's description of what became permissible *after* that period. It was only after the "compelling point" that the Court said permissible state regulations could include requirements as to the specialty qualifications of

the person who is to perform the abortion, the type of facility where it might be performed and similar types of regulations.

*Friendship Medical Cen., Ltd. v. Chicago Bd. of Health,* 505 F.2d 1141, 1150 (7th Cir. 1974) (footnote omitted).

 Further precedent supporting the decision of this Court may be gleaned from the Supreme Court's holding in *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). In *Doe,* the Supreme Court reviewed Georgia legislation setting forth licensing standards for abortion facilities and physicians. The licensing standards applied to all abortion procedures, without regard to the trimester of pregnancy when the abortion was performed. The Supreme Court held that these requirements were unconstitutional and then stated: "This is not to say that Georgia may not or should not, from and after the end of the first trimester, adopt standards for licensing all facilities where abortions may be performed so long as those standards are legitimately related to the objective the State seeks to accomplish." *Doe,* 410 U.S. at 194–95, 93 S.Ct. at 749. This Court therefore holds that the regulations imposed by La.Rev. Stat.Ann. §§ 40:1299.35.16, .17 are clearly unconstitutional because they impose restrictions upon a woman's right to obtain an abortion prior to the period when the State's interest in maternal health becomes compelling.

### ESTABLISHMENT OF RELIGION

 Plaintiffs' final argument attacks the entire Act as an establishment of religion in violation of the First Amendment of the Constitution. The Court finds that this argument has no merit. The Act satisfies the three prong test laid down in *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973). First, there is a clearly secular legislative purpose: health regulation for the protection of citizens undergoing a particular medical procedure. Second, the Act's primary effect neither

advances nor inhibits religion. As presently constituted, the Act no longer contains the language to which plaintiffs objected. *Plaintiffs' Memorandum of Law,* at 89–90. Third, the Act does not involve excessive entanglement with religion. Political fragmentation over abortion splinters individual families as well as religions, political parties, and church groups. The Act does not outlaw abortion; it merely attempts to regulate it, which is a valid exercise of the State's police powers. The Court therefore concludes that the Act as a whole does not violate the First Amendment.

For reasons previously stated, certain provisions of the Act [134] have been held to be unconstitutional, and therefore, the Court will enter an order striking the following sections:

1. La.Rev.Stat.Ann. § 40:1299.35.3

2. La.Rev.Stat.Ann. § 40:1299.35.4

3. La.Rev.Stat.Ann. § 40:1299.35.5

4. La.Rev.Stat.Ann. § 40:1299.35.6(A) insofar as it requires consent of a minor's parent or guardian

5. La.Rev.Stat.Ann. § 40:1299.35.6(B) insofar as it requires consent of a minor's parent or guardian

6. La.Rev.Stat.Ann. § 40:1299.35.6(B) (3)–(6)

7. La.Rev.Stat.Ann. § 40:1299.35.6(C) insofar as it requires consent of a minor's parent or guardian

8. La.Rev.Stat.Ann. § 40:1299.35.6(D) insofar as it requires consent of a minor's parent or guardian

9. La.Rev.Stat.Ann. § 40:1299.35.7

10. La.Rev.Stat.Ann. § 40:1299.35.8

11. La.Rev.Stat.Ann. § 40:1299.35.9

12. La.Rev.Stat.Ann. § 40:1299.35.10 (A)(4) insofar as it requires the doctor to list a woman's residence

13. La.Rev.Stat.Ann. § 40:1299.35.14

14. La.Rev.Stat.Ann. § 40:1299.35.16

15. La.Rev.Stat.Ann. § 40:1299.35.17

Injunctive relief is denied, as the Court assumes that Louisiana authorities will give credence to this decision. *Wooley v. Maynard,* 430 U.S. 705, 711–13, 97 S.Ct. 1428, 1433–34, 51 L.Ed.2d 752 (1977); *Planned Parenthood Ass'n. v. Fitzpatrick,* 401 F.Supp. 554, 582–83 (E.D.Pa.1975), *aff'd sub nom. Franklin v. Fitzpatrick,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976); *Hodgson v. Anderson,* 378 F.Supp. 1008, 1019 (D.Minn.1974), *aff'd in part, rev'd in part and remanded,* 542 F.2d 1350 (8th Cir. 1976).[135]

So ordered.

## ORDER

Pursuant to the opinion of the Court rendered this the 29th day of February, 1980;

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that the following sections of the Louisiana abortion statute, La.Rev.Stat.Ann. §§ 40:1299.35.1 *et seq.* (West Supp.1979), are hereby stricken as unconstitutional enactments:

1. La.Rev.Stat.Ann. § 40:1299.35.3

2. La.Rev.Stat.Ann. § 40:1299.35.4

3. La.Rev.Stat.Ann. § 40:1299.35.5

4. La.Rev.Stat.Ann. § 40:1299.35.6(A) insofar as it requires consent of a minor's parent or guardian

5. La.Rev.Stat.Ann. § 40:1299.35.6(B) insofar as it requires consent of a minor's parent or guardian

6. La.Rev.Stat.Ann. § 40:1299.35.6(B) (3)–(6)

**134.** Certain sections of the Act are not reported in the present West pocket part. They are the last two paragraphs of the act.

Section 2. If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items, or applications of this Act which can be given effect without the invalid provisions, items, or applications, and to this end the provisions of this Act are hereby declared severable.

Section 3. All laws or parts of laws in conflict herewith are hereby repealed.
1978 La.Sess.La.Serv.No. 435, §§ 2, 3 (West 1978).

**135.** "[A] Court should enter only a declaratory judgment, and not the injunctive relief requested, if [it is] satisfied that defendants will acquiesce in the decision holding the challenged provisions of the Act unconstitutional." *Planned Parenthood Ass'n v. Fitzpatrick,* 401 F.Supp. at 582, and cases cited therein.

7. La.Rev.Stat.Ann. § 40:1299.35.6(C) insofar as it requires consent of a minor's parent or guardian

8. La.Rev.Stat.Ann. § 40:1299.35.6(D) insofar as it requires consent of a minor's parent or guardian

9. La.Rev.Stat.Ann. § 40:1299.35.7

10. La.Rev.Stat.Ann. § 40:1299.35.8

11. La.Rev.Stat.Ann. § 40:1299.35.9

12. La.Rev.Stat.Ann. § 40:1299.35.10 (A)(4) insofar as it requires the doctor to list a woman's residence

13. La.Rev.Stat.Ann. § 40:1299.35.14

14. La.Rev.Stat.Ann. § 40:1299.35.16

15. La.Rev.Stat.Ann. § 40:1299.35.17;

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that injunctive relief is denied, as the Court assumes that Louisiana authorities will give credence to this decision. *Wooley v. Maynard,* 430 U.S. 705, 711–13, 97 S.Ct. 1428, 1433–34, 51 L.Ed.2d 752 (1977); *Planned Parenthood Ass'n. v. Fitzpatrick,* 401 F.Supp. 554, 582–83 (E.D.Pa.1975), *aff'd sub nom. Franklin v. Fitzpatrick,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976); *Hodgson v. Anderson,* 378 F.Supp. 1008, 1019 (D.Minn.1974), *aff'd in part, rev'd in part and remanded,* 542 F.2d 1350 (8th Cir. 1976).